IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| ROSA ANGELA GONZÁLEZ SANTOS, *et al.*,<br><br>　　　Plaintiffs,<br><br>v.<br><br>ANGEL TORRES MALDONADO, *et al.*,<br><br>　　　Defendants. | Civil No. 09-1850 (FAB/BJM) |

## REPORT AND RECOMMENDATION

Plaintiffs Rosa Angela González Santos ("González") and Brenda Lugo Caraballo ("Lugo") (collectively, "plaintiffs") brought this workplace sexual harassment and retaliation action against defendants Instituto Médico del Norte, Inc., d/b/a Hospital Wilma N. Vázquez ("Hospital"), Angel Torres-Maldonado ("Torres") and his conjugal partnership, Luis Cruz-Martínez ("Cruz") and his conjugal partnership, José Pabón-Quiñones and his conjugal partnership, Aymette García and her conjugal partnership, Eduarda Pabón, Enrique Vázquez, American International Insurance Company ("American"), and Liberty Mutual Insurance Corp. ("Liberty"), (collectively, "defendants"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Family and Medical Leave Act ("FMLA"), as amended, 29 U.S.C. § 2601 *et seq.*, and assorted Puerto Rico laws. (Docket No. 108). Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6),[1] which plaintiffs did not timely oppose.[2] (Docket Nos. 64, 96, 147, 150). For the reasons that follow, I recommend that the motion be **granted in part and denied in part**.

---

[1] While titled "Motion to Dismiss for Judgment on the Pleadings," defendants' motion proceeds as though it were under Rule 12(b)(6), not Rule 12(c). Since, as explained *infra*, there is no substantive difference between the respective standards of review, the nature of the motion does not affect the court's analysis.

[2] The current version of the complaint was filed after defendants filed their motion. All arguments raised in the motion to dismiss apply with equal force to the allegations of the operative complaint.

**González Santos,** *et al.* **v. Torres Maldonado,** *et al.*                     Page 2
Civil No. 09-1850 (FAB/BJM)
REPORT AND RECOMMENDATION

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are drawn from the allegations of the operative complaint. (Docket No. 108).

Defendant Hospital is a private hospital located in Vega Baja employing more than 25 employees during the year preceding the filing of the complaint.  It is the current or past employer of plaintiffs and the individual defendants.  Plaintiff González is a secretary at the Hospital's Imaging Department.  Plaintiff Lugo was a medical technologist at the Hospital until her termination on January 12, 2009.  Defendant Torres directed the Imaging Department at the Hospital until his termination on or about April 18, 2008.  García is the Hospital's Human Resources ("HR") Manager, Cruz is the supervisor of its Radiology Department, Pabón-Quiñones is an administrator and President of the Hospital's Board of Directors, Pabón and Vázquez are licensed physicians and the major stockholders and owners of the Hospital, and American and Liberty are the Hospital's insurers.  (Docket No. 108, ¶¶ 3, 6-12, 15, 114, 124).

I.        **Facts Relevant to Plaintiff González**

On November 16, 2006, Torres called González to his office to take dictation and make notes.  He had music playing and asked her to dance with him.  When she said no, he closed and locked the office door, but unlocked and opened it when she asked.  While they worked, Torres gave her discomfiting looks and told her he needed a secretary and she could be it.  When plaintiff said her back hurt, he offered her his chair, then started staring fixedly at her.  He asked if she thought he was "peeping" at her; she told him she did not like his look.  Although intimidated, plaintiff did not dare get up because Torres said she had to finish the task.  When Torres had to leave, plaintiff finished the task as he instructed her.  Later that day, Torres asked her to come to his office to complete some remaining work, but plaintiff was afraid and insisted on doing the work in her own office.  (Id., ¶¶ 21-24).

The following day, Torres called González to his office.  He asked her if she was scared to go to his office alone, telling her, "Since I am here by myself, you should be scared."  He suggested

that they go out together and said nobody would find out.  González told Torres he was crazy and that she was married, and he told her to think about it.  When she left his office, he called after her that he would like to kiss her.  She shouted at him that he was crazy, ran away, and started crying. (Id., ¶¶ 25-26).

At work the following Saturday, Torres called González and flirtatiously asked what she was planning to wear to an upcoming employee softball game, namely whether she would wear shorts and what kind of shirt.  Plaintiff did not answer, and Torres asked if his words upset her.  She said she did not like it and asked him to show her some respect.  He asked for the baseball park's address; she said she did not know, repeated that she was not comfortable with his comments, then hung up. (Id., ¶ 27).

On December 1, 2006, Torres sent González a document stating that he had seen people outside their work areas during working hours, that employees could leave their work areas only if their work required it and with his or Cruz's authorization, and that break periods were not an employee right.  (Id., ¶ 29).  On December 12, 2006, Cruz began monitoring González's breaks and departures from her work area on orders from Torres.  On December 15, 2006, Torres gave González a memo regarding a report of improper behavior by a Hospital receptionist and indicated he would not tolerate such an attitude.  González checked the report and explained that it was from a time when another secretary was on duty.  González called García, who had been copied on the memo, and told her they should verify their information before handing out disciplinary memos, but García gave González no explanation.  (Id., ¶ 30).

On Torres's orders, Cruz began making González keep the door in her work area closed so that she would not interact with nearby coworkers, even though other workers were allowed to leave the door open if they covered for González in her office.  Torres began scolding González out loud for minor things and made other workers request permission from the supervisor before they could enter González's office.  When housekeeping personnel cleaned González's office, they had to clean and close the door immediately, making González feel as though she were being quarantined.  (Id., ¶¶ 32-33).

**González Santos, *et al.* v. Torres Maldonado, *et al.*** Page 4
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

On December 20, 2006, Cruz twice monitored González's break periods and told González that breaks were a privilege which she could not take while there was work to do, although other employees took their breaks without any such admonitions. (Id., ¶ 31). The following day, Cruz called Torres to report González's "problematic" behavior when she took her morning break and ordered González's coworker to call and tell Cruz when González returned from her breaks. (Id., ¶ 34). When González called García in tears to complain that Torres and Cruz were singling her out for scolding and harassment, García told González that Cruz had to follow Torres's instructions. García had to end the call and said she would call González back, but never did. Later that day, Torres held an all-hands meeting where he re-emphasized the rules about break periods, saying breaks were a privilege and could not be taken while there was work. While saying this, he looked sternly and directly at González. Torres emphasized that employees had to treat their supervisor Cruz with respect and threatened discipline for insubordination if they did not do so. (Id., ¶¶ 35-36).

On December 22, 2006, González got HR Director Eugenia Martínez to approve her pending five-day vacation request after explaining to Martínez that she feared Torres would deny it. Torres got upset with González for not going through the proper channels. (Id., ¶¶ 37, 67). When González's husband fell sick on December 26, González could not reach Cruz or Torres and had to arrange her time off to care for him with Martínez's secretary, Suheil Montalvo, who told González to return on Saturday, January 20, 2007. When González arrived on that date, she learned that Torres believed she was returning on Monday and so had scheduled another worker, who called Torres. Torres scolded González for failing to go through the right channels and told her that what she had done was an act of insubordination. González explained that Montalvo had told her to return that day, and Torres told González to go home and come back on Monday. (Id., ¶¶ 38-41).

When González arrived on Monday, January 22, 2007, Torres gave her a memo noting the return date mixup, reminding González that Cruz was her supervisor and was under Torres's direction, and stating that it was an act of insubordination to them both not to use the proper channels. Torres would not hear González's version of what happened, so González called García to explain and complain about Torres's conduct. García said it was a misunderstanding due to lack

of communication, which González blamed on Torres.  The call ended with García telling González that González would no longer be scheduled for Saturdays.  (Id., ¶¶ 42-43).

A year later, on February 8, 2008, Torres added other functions to González's duties without providing any training, preparation, or salary increase.  (Id., ¶ 44).  Four days later, Torres sent González a memo, addressed to her and copied to Cruz, noting complaints from doctors and patients about inaccurate medical transcription reports.  The memo said that Torres would not tolerate such mistakes and would take disciplinary measures if they recurred.  González denied to Cruz that the memo concerned her work and refused to sign it, but Cruz insisted, so González signed it but wrote in that she disagreed with it because she did not do the reports.  Soon after, Torres called González to his office and insisted that González was responsible for the reports.  González denied this, since report transcription was not part of her duties.  Torres loudly berated her not to shift blame and to accept fault, until she became so upset she cried.  She returned to her office, looked up the dictation recording at issue, and discovered that another employee had been at fault.  She called Cruz to tell him Torres had been yelling and blaming her, had Cruz listen to the dictation so he realized the error, and told him to be sure before issuing a memo to an employee because such mistaken accusations were unfair.  (Id., ¶¶ 45-47).

On February 14, 2008, González was making rounds delivering documents in a small cart when a patient asked her if his test results were ready.  She said she was not sure and sent him to Cruz.  While in Cruz's office, she slightly bumped Cruz's desk with her cart, and Cruz shouted in front of the patient that she had hit his computer and it was "like sabotage."  Cruz did not have the patient's results and sent him to the Hospital's administration to ask for them.  Cruz then got into an argument with González over what she had told the patient and got Torres involved, who verified that the patient had picked up his results.  González told Cruz everyone was blaming her for no good reason.  (Id., ¶¶ 48-50).  The following day, Cruz, Torres, and García all induced González to take her lunch break even though she was still finishing up some reports.  (Id., ¶ 51).  On February 22, Torres and Cruz discussed another employee's job performance with González in Torres's office, which made González think Torres probably did the same thing with regard to her.  (Id., ¶ 52).

On March 4, 2008, González had a pituitary MRI done at the hospital.  The female MRI technologist first told her she did not have to remove her shirt for the MRI, but halfway through, she told González she had to take off her shirt, bra, and girdle on Torres's orders because they were affecting the study, and González found out Torres was the one performing the MRI.  González became very nervous and panicked, and when the MRI was done she asked Torres why he was there. He said he did it to corroborate that González was okay and arrogantly told her that the MRI was negative and to get out of there and go back to work.  (Id., ¶ 53).  González immediately tried in vain to contact the personnel office.  (Id., ¶ 54).  A few minutes later, Torres called González to his office, where she arrived to find Cruz as well.  Torres started discussing workflow between González and another employee in the reception area to which González had just recently been assigned.  When González pointed out that she had just started working in that area, Torres said loudly and arrogantly that he was fed up with González's excuses and would take disciplinary measures against her if she did not do what he told her.  She said she always did her work and had never received any complaints, and Torres sent her away.  (Id., ¶¶ 55-57).

On March 12, 2008, González asked García about the status of a pending meeting which Torres had mentioned.  García asked what meeting González was referring to, and González said "the one regarding a case we have pending," adding that she had been requesting a meeting with García for a long time but that García was never available.  She told García about Torres's harassment, but García did not hold a meeting that day despite González's repeated requests for one. (Id., ¶ 58).  Two days later, Torres called González into his office to scold her for not doing her work correctly and not showing respect and courtesy to patients and other employees.  He loudly demanded that she sign a disciplinary memorandum, which González refused to do, so Torres gave the memo to Cruz to sign and write in that González would not sign it.  González started crying and having an emotional crisis, and Torres yelled at her to get out of his office.  (Id., ¶¶ 59-60).

Dizzy, disoriented, and shaking, González made her way to the emergency room, where she vomited.  She was examined and treated by the doctor on duty, to whom she described the "sexual and labor harassment" she was undergoing from Torres and Cruz.  The doctor prescribed her

medication for anxiety and issued a medical certificate ordering a five-day rest period.  (Id., ¶ 61).

When she took the certificate to Cruz, Torres, who was present, questioned why the doctor had

ordered such a long rest period, and González said it was for anxiety attacks due to Torres's sexual

harassment and retaliatory acts toward her, which made Cruz's eyes go wide.  The treating doctor

later told González that Cruz tried to have him change his diagnosis.  (Id., ¶¶ 62-63).

        After spending that weekend depressed and anxious that she might be fired for rejecting

Torres's sexual advances, González went to the State Insurance Fund ("SIF") on March 17, 2008 to

apply for coverage for treatment of work-related injuries.  Two days later, Torres sent a letter to the

HR department alleging work deficiencies by González.  (Id., ¶¶ 64-65).  When González went to

the HR office on March 26, 2008 with the SIF forms which the employer needed to fill out, García

denied any knowledge of any past incidents of harassment that González had told her about and

González's attempts to meet with her about such harassment.  (Id., ¶ 66).  On April 8, 2008,

González sent a memorandum to García and Martínez, copied to Pabón, in which she listed some

of the most recent harassing and retaliatory acts by Torres and requested prompt attention to the

matter.  The memo noted that González had filed a complaint with HR as far back as November

2006 and that she had repeatedly complained to and tried in vain to meet with García.  (Id., ¶ 67).

        González remained reported to the SIF until August 14, 2008.  On her return, she noticed

Torres was no longer working at the Hospital and learned that in her absence, he had issued four

memoranda about her allegedly deficient work performance and disciplinary violations.  That day,

she met with Cruz, who apologized to her, saying he had to follow Torres's orders and knew it had

been unfair to her but that there was nothing he could do.  She said he could have reported the matter

to HR, and Cruz said he had tried but García refused to meet with him.  Given Cruz's attitude,

González felt she was returning to the same hostile environment she had left, except that the original

harasser was no longer there.  (Id., ¶ 68).

        On December 24, 2008, García authorized personnel from the departments of records,

invoicing, laboratory, physical therapy, HR, and others to leave early at 3:00 p.m., but González was

not allowed to leave until 6:00 p.m.  In a meeting on December 26, García and Cruz explained that

she worked with the public and might be needed, and only office workers had been authorized to leave.  González replied that per her job description, she was an office worker too, and that other employees with the same responsibilities also dealt with the public.  She requested a written explanation for this discriminatory treatment, which García denied, using language González considered disrespectful and a continuation of the hostile environment that had originated in November 2006 with Torres's behavior.  (Id., ¶ 69).

On January 8, 2009, González notified Pabón about the December 24 and 26 incidents, but still no action was taken.  García and Cruz continued giving González negative remarks and looks, which she perceived as further retaliation for having complained about Torres's sexually harassing behavior.  In late 2008 and on January 11, 2009, when Pabón called the radiology department and González answered, Pabón would ask, "Do you still work here?", which González took to be a retaliatory gesture insinuating she should be fired from the Hospital.  (Id., ¶¶ 70-71).  On January 16, 2009, García wrote González a memo asking her to submit the reasons why she felt discriminated against, what type of discrimination she meant, and the names of the people causing the discrimination and those who had knowledge of it.  (Id., ¶ 72).

On May 11, 2009, while González was having lunch at the Hospital cafeteria, Vázquez approached her and said she looked very serious and quiet while eating and that he would have to bring Torres in to make her laugh.  González took this comment as disrespectful since Vázquez knew about Torres's harassment and tolerated the resulting hostile environment.  (Id., ¶ 73).

On August 24, 2009, Cruz met with González and told her about problems he had with Torres and that at Torres's new workplace he had a similar situation to the one he had at the Hospital.  González asked Cruz why he, as a supervisor, had allowed Torres's behavior, and he said that HR was never available when he tried to meet with them about those incidents.  He told González that he had told her sooner or later Torres would be discharged from the Hospital.  González felt it was an additional burden to know that managerial staff knew about Torres's harassment and did nothing.  (Id., ¶ 74).

On October 30, 2009, González was in a car accident and was taken to another hospital's ER. She was ordered to rest until November 5, 2009, and her husband called Cruz that evening to tell him about the accident and that González would not return until November 6. On that day, González went to work and gave Cruz the doctor's certificate. He left briefly, then returned and said that García had asked that González provide a copy of the police report of the accident. She gave Cruz the police complaint number, but he insisted that she had to produce the report also. Later that day, Cruz gave González a memo from García, addressed to all employees, setting out the requirements for any medical certificate brought in by an employee. González perceived this memo as retaliation by García for filing a sexual harassment complaint against Torres. She told Cruz the memo was disrespectful and discriminatory, and Cruz said, "Well, you know Mrs. García's work style." (Id., ¶¶ 75-76).

Through the beginning and middle of 2010, Cruz kept up a constant pattern of animosity and bitterness towards González, including throwing papers and files on her desk instead of putting them in the inbox tray on her desk, which she perceived as retaliation for pursuing her sexual harassment and hostile work environment claim. (Id., ¶ 77). In late May or early June of 2010, several x-ray technologists shouted at González for sending a patient over to them for x-rays, and when Cruz did nothing about it, González perceived this as retaliation for filing a claim against the Hospital, Torres, and him. (Id., ¶¶ 78-81). In summer of 2010, Martínez from HR told González, who was pregnant, what type of maternity uniform she should wear. When González could not find clothing in the required color, she asked to wear a different color, but Martínez denied the request. González perceived this as retaliation since other pregnant secretaries in other Hospital departments were allowed to choose their own maternity clothing. (Id., ¶¶ 82-83).

From early 2010 up through September 7, 2010, Cruz would not allow González to eat at work and would constantly check on her to see if she was having breakfast in the office and scold her for doing so, which she perceived as retaliation. González became ill and dehydrated in early August 2010 from not being allowed to eat or take breaks and had to go to the ER. When she

returned to work on August 10, 2010 after a prescribed three-day rest period, she was reprimanded near the end of the day by García for coming in on that day because her medical certificate said her leave was through August 10.  García told González to get a new certificate stating her leave was up to August 9.  González perceived it as retaliation for HR to wait until the end of the day to tell her this instead of doing so at the beginning of the day when she delivered the medical certificate.  (Id., ¶¶ 84-86).

From early 2010 onward, González had Fridays off and another employee filled in for her.  Cruz constantly complained on Mondays about the work allegedly performed by González despite knowing she was off Fridays.  When González pointed out that another employee was performing the work about which he was complaining, Cruz got quiet and did nothing, and González perceived his inaction as more retaliation for complaining about the hostile work environment.  (Id., ¶ 87).  On August 24, 2010, González suffered a gestational edema, which she blamed on stress and anxiety caused by her work situation, and was ordered to take a two-week rest period.  She presented  this information in an amended EEOC complaint on September 7, 2010.  (Id., ¶ 88).

On October 12 and 13, 2010, González was deposed by defendants' counsel despite being close to her delivery date.  Defendants' counsel found that González had Torres's Social Security number ("SSN") written on a paper in a binder of documents she brought to the deposition, which she had allowed them to view.  She explained that she had obtained the SSN while Torres was still working at the Hospital to give to her case investigator to do a background check on Torres.  She never divulged the SSN, nor was it used by her investigator.  (Id., ¶¶ 88a-88d).

On November 10, 2010, García terminated González during a short meeting with González and the Hospital's Security Director, Machado.  González, who was still pregnant, was given a discharge letter and a check paying out her Christmas bonus and accumulated vacation time, but not maternity leave.  González read the letter during the meeting; it stated she was being discharged for repeated noncompliance and for violating confidentiality rules due to divulging and improperly using employee information.  She asked García what she had done to violate the rules, and García

eventually stated that it was due to the issue of Torres's SSN.  González signed and dated the letter and told García she disagreed with the reasons García gave and the allegations against her.  She went back to her work area, got her things, and left.  (Id., ¶¶ 88e-88l).  González alleges that her dismissal was in retaliation for complaining about Torres's sexual harassment and that the accusations against her regarding allegedly improper use of Torres's SSN are pretextual and untrue.  (Id., ¶¶ 88m-88o).

## II.    Facts Relevant to Plaintiff Lugo

On or about November 2006, at an evening event for the x-ray technologists, Torres, in Cruz's presence, invited Lugo to go to some restaurants at the Dorado beach.  She immediately refused.  That same month, Torres held a meeting of all Radiology Department clerical and technological personnel, where Torres and Cruz exchanged such objects as condoms, whips, paddles, and pornographic photos, to the disgust and embarrassment of female employees.  They also photographed the people present, who were mostly female employees, including Lugo.  (Id., ¶ 91).  In early 2007, Torres showed Lugo and another female employee a picture on his computer of a naked baby with adult genitals, laughed, and asked them if they liked the picture, embarrassing them.  (Id., ¶ 92).

In early 2007, Torres called Lugo to tell her he had gotten into a problem relating to González for which he could lose his job.  He wanted to know what Lugo would tell Martínez about Torres's treatment of her if Martínez asked, since he had often seen Lugo and González talking together.  Torres asked whether Lugo would file a harassment complaint against him as González had done.  Lugo, uncomfortable, replied that if asked about González, she would tell the truth, and that their relationship was purely work-related.  (Id.).

In early January 2007, Lugo requested permission from Torres to attend a continuing education seminar, but Torres told her he would not let her go because he could not go, and he laughed and mocked her.  (Id., ¶ 93).  Also in early 2007, when Lugo needed to change clothes at work one day, Torres offered to let her change in his office since the bathroom was occupied.  She refused and said she would wait, and Torres told her she looked very good.  (Id., ¶ 94).

Ever since González filed her sexual harassment complaint against Torres, Torres and other Hospital personnel would make negative comments about González, saying she was lying. At the same time, Torres and Cruz began a campaign against Lugo. When Lugo told Cruz that Torres was treating Lugo unfairly, Cruz told a secretary who was listening to the conversation that whoever messed with Torres had to mess with Cruz. (Id., ¶ 95). Lugo then tried unsuccessfully to talk to García, who would never take Lugo's calls and was never available to meet with her. When García finally met with Lugo, she defended Torres and Cruz and downplayed Lugo's complaints about them. Meanwhile, Torres and Cruz continued to scold and yell at Lugo whenever they could. Cruz called Lugo a bitch in front of González once when Lugo called to ask him a question, saying Lugo knew the answer and was calling just to bother him. Cruz and Torres began issuing Lugo and her coworker, Aida Nater, false memos about absenteeism. (Id., ¶ 96).

In June 2007, Lugo asked Torres if she could take off half an hour for lunch, and he told her she had to take a full hour as required by HR. Lugo said she had too much work to take a full hour, she had the right to eat, and she would not take a lunch at all. When she returned to her work area, Torres phoned and shouted that she was being disrespectful; she told him he was the disrespectful one, and he hung up. (Id., ¶ 97).

In September 2007, the Hospital opened a hyperbaric chamber department, redecorated the Nuclear Medicine reception area, and installed telephone lines so that Nuclear Medicine personnel, including Lugo, who worked there as a secretary, could take calls from the hyperbaric chamber department. These changes were made without informing plaintiffs; Cruz said the changes were ordered by engineer Pabón. In addition to her other duties in Nuclear Medicine, Lugo, who was usually by herself, had to be the hyperbaric chamber department's receptionist, although this was not in her work functions. (Id., ¶ 98).

The department's director, Dr. Chinea, became more demanding regarding how secretaries should do their work. He and his daughter, Pabón's wife, constantly supervised Lugo to make sure she was not talking to anyone for non-business-related purposes, and they called Cruz if she did.

Lugo continued having to do jobs outside of her work functions and Cruz, Torres, or García would be on her back if she did not do them.  (Id., ¶ 99).  In Nater's presence, Torres gave Lugo a memorandum for insubordination to a supervisor (which constituted grounds for immediate termination), but Lugo refused to sign it.  Lugo requested a meeting with García, who met with Lugo only after Lugo wrote a letter to Pabón, the Hospital's engineer and administrator.  García defended Torres and did not resolve Lugo's problem; she backed up what Torres had said about taking a lunch hour and insisted that Lugo sign the memorandum.  Lugo said it was unfair and would not sign it, but García said she would put the memo in Lugo's personnel file regardless.  (Id., ¶ 100).

Lugo was out sick from October 15 through 17, 2007, and when she returned on October 18, Torres gave her a memorandum listing all her absences since the start of her employment, including dates when Lugo had been at work and dates for which she had submitted medical certificates.  Lugo protested that she could not lose her job for absences for which she had medical certificates.  Cruz and Torres corralled Lugo in the x-ray office, one in front of her and one behind her, and insisted that she sign the memo.  Lugo felt physically threatened and afraid, so she signed it.  (Id., ¶¶ 101-02).

On or about November 2007, the fumes from a paint job underway in the Nuclear Medicine area were making Lugo and Nater sick, but Cruz would not let them leave the department without authorization by phone from Torres, who was out of the area at the time.  When Lugo could not stand it anymore and told Cruz by phone that she was leaving, he came to her office and yelled furiously for her to sit down, but then took Lugo and Nater to another area.  (Id., ¶ 103).

Torres suspended Nater on January 28, 2008.  (Id., ¶ 104).  The next day, Lugo asked permission from her supervisors to go to the examining board the following day, January 30, in order to renew her professional license.  Such announced absences were considered normal and were either treated as part of the work day or charged to vacation time.  However, Torres and García would not allow Lugo either option, so she lost eight hours' pay for January 30.  Lugo learned that day that Torres had let other Hospital personnel go renew their licenses without losing pay.  (Id., ¶ 105).

González Santos, *et al.* v. Torres Maldonado, *et al.*                                     Page 14
Civil No. 09-1850 (FAB/BJM)
REPORT AND RECOMMENDATION

On February 1, 2008, the Nuclear Medicine equipment malfunctioned, and Cruz came and stood by Lugo and told her in a hostile and arrogant manner to try to fix the machine.  Lugo told him she did not know how.  Cruz got upset and called a repair company, Alfa, to tell Lugo how to fix it by phone, but an Alfa employee who happened to be at the Hospital came by and resolved the problem.  (Id., ¶ 106).

Lugo came down with dengue fever on March 25, 2008, and left work at noon.  She went to a medical office complex in Arecibo to pick up her lab results.  While there, she stopped by Arecibo Radiology, where she had formerly worked, to say hello to her old coworkers.  While she was there, somebody called and asked for her, but hung up when Lugo got on the phone.  Lugo thought nothing of the incident, but Torres later alleged falsely that Lugo was moonlighting at Arecibo Radiology. (Id., ¶¶ 108-09).

After returning from her suspension, Nater was constantly assigned to work in another area, leaving the Nuclear Medicine department without a secretary, so Lugo had to cover for her.  Torres fired Nater on Friday, March 28, 2008, while Lugo was still out sick.  He gave Nater's position to another employee and took away Lugo's keys to give to that employee.  (Id., ¶ 107).  The same day, March 28, a coworker, Miguel Aponte, called Lugo to tell her Torres was saying he would fire Lugo when she got back from her absence.  Lugo got nervous, called the Hospital in tears, and spoke with an administrator, Vilar, who tried to calm her down and promised her an explanation when she returned to work.  Lugo ended up going to the ER at another hospital in Arecibo, where she was treated and prescribed antidepressants for her condition.  (Id., ¶ 109).  On March 30, 2008, Aponte called Lugo and told her Torres had been saying he was going to fire Lugo for giving him a false medical certificate when in fact she was working at Arecibo Radiology.  Lugo called HR, but no one answered, so she called Administration and spoke with Vilar, who again tried to calm her and said she was owed an explanation.  (Id., ¶ 110).

Upon Lugo's return to work, nobody would say anything to her.  Three days after Lugo's

return, Martínez asked Lugo to write out all the incidents related to Torres, and she did so.  Days

later, Torres was terminated.  Two days after that, the Hospital held a training for supervisors and

administrators on how to treat employees and avoid complaints.  Lugo began to suppose that her

situation was due to her participation as a witness in González's case.  This made her tense, and

since Vilar had not yet provided the promised explanation, she wrote to Pabón.  (Id., ¶¶ 111-112).

The next day, Martínez and García met with Lugo in Martínez's office, where they questioned her

about every incident in her complaint letter about Torres.  García denied that she had avoided

meeting with Lugo or that Lugo had ever notified her about problems with Torres.  Martínez told

Lugo that from then on, Martínez, not García, would handle Lugo's complaints.  (Id., ¶ 113).  On

April 18, 2008, Montalvo told Lugo that García had told Montalvo that Torres had been discharged

because of Lugo's complaint and HR personnel had read pieces of Lugo's letter to him.  (Id., ¶ 114).

Soon after Torres's termination, Cruz apologized to Lugo for everything that had happened

and told her that his actions against her were all on Torres's orders.  Cruz told her they would start

over, but by May 2008, he started treating Lugo in a hostile fashion again, telling her she was

working too much overtime and that García could not accept Lugo's extra hours.  García met with

Lugo soon after and warned that if Lugo did not lower her extra hours, she risked losing her job since

the Hospital had financial problems and Lugo had to avoid wasting money.  Lugo tried to explain

to Cruz and García that her overtime was necessary, particularly since Lugo was by herself with

numerous duties to perform.  (Id., ¶¶ 115-16).

Around late July or early August 2008, Lugo learned that two male Hospital employees were

gossiping that Lugo was having an affair.  Lugo told Cruz that she would not stand such comments,

and Cruz said he would not let any man go to Lugo's office if he was not there.  (Id., ¶ 117).

In August 2008, Lugo told Cruz that her eyes were hurting and she needed to go to the

Hospital's ER, but Cruz made her finish her work first.  The treating doctor at the ER, Dr. Torres,

diagnosed conjunctivitis and gave her a medical certificate for five days' leave since her condition

was contagious.  Dr. Torres's secretary told Lugo days later that Cruz and Pabón questioned why Dr. Torres let Lugo off for so long and asked her to change her diagnosis, but Dr. Torres refused.  When Lugo returned, the harassment increased.  Lugo's coworker, Aurely Alvarado, was forbidden to speak to Lugo; and both Lugo and Alvarado were forbidden to get up from their desks without telling Cruz.  The office's temperature was fixed at 60 degrees, making it too cold to work.  (Id., ¶¶ 118-19).  All this caused Lugo more tension; she could not go to work unless she took a relaxant or natural remedies to be calm.  (Id., ¶ 120).

Cruz did not allow Lugo to have breakfast at work or have her coworkers bring her breakfast, or else he would get upset.  He isolated Lugo so nobody could talk to her, even if, for example, janitorial staff needed to repair something in her area.  If Cruz went to Lugo's work area and found someone else there, he would get upset, shout at her, and slam the door when he left.  He would monitor her when she arrived and during her coffee breaks, and forbade her from going to the cafeteria with Alvarado or any other employee.  (Id.).

The Hospital had agreed to pay for Lugo to attend an annual nuclear medicine convention, but when she requested compensation for the 2008 convention, García denied remembering any such agreement.  In the end, García threw down a check for $100 on Lugo's desk, saying that was all she could give Lugo.  When Lugo asked how she could forget the agreement when the Hospital had paid for previous years, García left angrily.  (Id., ¶ 122).

In December 2008, Lugo was supposed to take vacation and had accumulated 23 days' vacation time.  After initially refusing to allow Lugo to take a vacation unless she got someone to cover for her, García permitted her to take ten days' leave and return the day before Three Kings Day.  Lugo asked García as a favor to allow her to return after Three Kings Day, and García arrogantly refused.  Lugo asked for an explanation, and García told her she had to begin work.  Lugo returned from vacation to work on January 5, 2009, then had Three Kings Day off.  After working a full day on January 7, 2009, Lugo had strong chest pains and difficulty breathing and went to

another hospital's ER.  (Id., ¶¶ 123-24).  The ER referred Lugo to a cardiologist, who issued a

medical certificate for several days so she could get tests done.  (Id., ¶ 124). Lugo's test results were

inconclusive; she was diagnosed with hypoglycemia, which she blames on the irregular schedule of

her breaks and lunch periods at the Hospital.  Lugo had also suffered a panic attack, which she

attributes to nervousness and stress.  (Id., ¶¶ 126-27).

On Saturday, January 10, 2009, Lugo received a return-receipt letter from García discharging

her from the Hospital for the stated reason that the Nuclear Medicine department had been closed.

(Id., ¶ 124).  Alvarado was also discharged at the end of her work day on January 9, 2009.  Lugo was

never given any other explanation for her discharge, and the possibility of the department's closure

had never been mentioned to her.  (Id., ¶ 125).  Lugo was unemployed until the end of March 2009.

In August 2009, the Hospital gave Lugo an offer to return to work as a Nuclear Medicine

technologist, which Lugo refused based on the negative and traumatic experiences she had

undergone in 2007, 2008, and 2009 under the supervision of Torres and Cruz.  (Id., ¶ 128).  Neither

Lugo nor González was ever informed of their rights and benefits under the FMLA.  (Id., ¶ 129).

Plaintiffs allege that González and Lugo both complied with all EEOC procedures, received

an EEOC letter authorizing them to sue, and complied with the time limitations necessary to bring

the present action.  (Id., ¶ 1; Docket Nos. 50-5, 64-1).  After González initially filed suit on August

26, 2009 and amended the complaint in January 2010 (Docket Nos. 1, 5), the court allowed Lugo

to join as a co-plaintiff (Docket No. 22), and plaintiffs filed the second amended complaint, adding

Lugo's claims, on April 22, 2010.  (Docket No. 23).  Plaintiffs subsequently filed third, fourth, and

fifth amended complaints to add allegations pertaining to recent factual developments and to name

the defendant insurance companies; the last amended complaint was filed on March 31, 2011.

(Docket Nos. 50-6, 75-2, 108).

Plaintiffs allege that defendants' conduct has harmed their physical and mental health,

requiring medical treatment, and has had negative effects on their family relationships.  González

and Lugo claim punitive damages and compensatory damages, doubled as applicable under Puerto Rico law, totaling $2.8 million and $2.2 million, respectively.  (Docket No. 108, ¶¶ 137-39). Plaintiffs also request preliminary and permanent injunctive relief against any further violation of plaintiffs' civil rights or continuation of the alleged sexual harassment and hostile work environment, declaratory relief, attorneys' fees, and seniority and back pay for González.  (Id., p. 58-60).

Plaintiffs allege the following claims, spread across four causes of action: (1) sex-based discrimination and retaliation under Title VII; (2) negligence, intentional infliction of emotional distress, and vicarious liability under Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 5141, 5142; (3) violation of the Puerto Rico laws against workplace discrimination, harassment, and retaliation, which, while not named by plaintiffs, include Law 100 of June 30, 1959, 29 L.P.R.A. § 146 *et seq.* ("Law 100"), Law 69 of July 6, 1985, 29 L.P.R.A. § 1321 *et seq.* ("Law 69"), Law 17 of April 22, 1988, 29 L.P.R.A. § 155 *et seq.* ("Law 17"), and Law 115 of December 20, 1991, 29 L.P.R.A. § 194 *et seq.* ("Law 115"); (4) violation of plaintiffs' rights under the FMLA; and (5) violation of plaintiffs' First Amendment rights, U.S. Const. amend. I.  (Id., ¶¶ 129-36).

## LEGAL STANDARD

"[T]o survive a Rule 12(b)(6) motion (and, by extension, a Rule 12(c) motion) a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'"  Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).  The court draws factual inferences in favor of the non-moving party. Díaz-Romero v. Mukasey, 514 F.3d 115, 116 (1st Cir. 2008).  The court may "augment those facts with facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice."  Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005).  In particular, when "a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the

pleadings and the trial court can review it" in deciding the motion.  Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998); Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007).

While a complaint need not contain detailed factual allegations in order to withstand dismissal, a plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal citation omitted).  The court need not accept as true legal conclusions or "naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. ___, 129 S.Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 557) (internal alteration omitted); Maldonado v. Fontanes, 568 F.3d 263, 267 (1st Cir. 2009).  The complaint must allege enough factual content to nudge a claim across the line from conceivable to plausible. Iqbal, 129 S.Ct. at 1952 (citing Twombly, 550 U.S. at 570); Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595-96 (1st Cir. 2011).  The court's assessment of the pleadings is context-specific, requiring the court "to draw on its judicial experience and common sense." Id. at 1949.  The plaintiff must show more than the "sheer possibility that a defendant has acted unlawfully." Id.  Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but has not shown, that the pleader is entitled to relief.  Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).  "In short, an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." Ocasio-Hernández v. Fortuño-Burset, ___ F.3d ___, 2011 WL 1228768, at *8 (1st Cir. Apr. 1, 2011).

Following Twombly and Iqbal, the First Circuit recently set forth a two-pronged approach for courts to employ in evaluating the sufficiency of a complaint.  After first identifying and disregarding conclusory statements in the complaint, the court then treats the remaining, non-conclusory factual allegations as true and determines whether those combined allegations allow the court to infer that the defendant is liable for the misconduct alleged.  If so, the claim has facial plausibility, even if a plaintiff's recovery strikes the court as very remote and unlikely.  Id. at *9

(citations omitted).  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint."  Id.

## DISCUSSION

## I.      First Amendment Claim

Plaintiffs' final cause of action claims that defendants, *i.e.*, a private institution and its employees, violated plaintiffs' First Amendment speech and association rights.  (Docket No. 108, ¶¶ 11, 135-36).  "Obviously, only the government can violate First Amendment rights," so, absent any allegation whatsoever of state action, this claim should be **dismissed**.  McGuire v. Reilly, 386 F.3d 45, 60 (1st Cir. 2004) (citations omitted).  See also Fed. R. Civ. P. 11(b)(2).

## II.     FMLA Claim

The FMLA "provides eligible employees of covered employers" with certain rights, Vazquez Vazquez v. Checkpoint Sys. of P.R., Inc., 609 F. Supp. 2d 217, 220-21 (D.P.R. 2009) (citing 29 U.S.C. § 2612; further citations omitted), and protects employees from discrimination for exercising those rights.  29 U.S.C. § 2615; see also Torrente-Leyva v. Capitol Sec. Police, Inc., 2011 WL 148051, at *4 (D.P.R. Jan. 18, 2011) (citation omitted).  To be an "eligible employee," an employee "must first be employed by an employer of at least 50 employees within 75 miles of his or her worksite."  Pineiro Díaz v. Adchem Pharma Operations, 2005 WL 2397489, at *12 (D.P.R. Sept. 28, 2005) (citing 29 U.S.C. § 2611).  A "covered employer" is one that "employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  29 U.S.C. § 2611(4)(A)(i).

Plaintiffs' third cause of action alleges in a conclusory fashion that defendants violated the FMLA, but they allege that the Hospital employed more than 25 employees during the preceding year – below the 50-employee threshold established by the Act.  (Docket No. 108, ¶¶ 11, 128, 133-34).  Therefore, as defendants note (Docket No. 64, p. 28), plaintiffs have failed to plausibly allege that the Hospital is a covered employer or that they are eligible employees under the FMLA.  Pineiro

<u>Diaz</u>, 2005 WL 2397489, at *12 (amended complaint failed to plead, *inter alia*, that each plaintiff was an eligible employee and that each defendant was covered by the law).   Accordingly, I recommend that the FMLA claim be **dismissed**.

### III.    Title VII Claims

Title VII prohibits sex-based discrimination by an employer, as well as retaliation against an employee for engaging in conduct protected under Title VII.  42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a).  Defendants argue variously that plaintiffs' Title VII claims against the individual defendants must be dismissed, that the claims are time-barred, and that plaintiffs have not sufficiently alleged their Title VII claims under the <u>Iqbal</u>/<u>Twombly</u> pleading standard.  I address each argument in turn.

#### A.      Individual Liability

Title VII does not provide for individual employee liability.  <u>Fantini v. Salem State Coll.</u>, 557 F.3d 22, 30 (1st Cir. 2009).  I therefore recommend that, per their request (Docket Nos. 64, p. 4-7; 96), the court **dismiss with prejudice** the Title VII claims against all individual defendants and, where applicable, their conjugal partnerships.

#### B.      Lugo's Claims

Defendants argue that the court lacks jurisdiction over plaintiff Lugo's Title VII claims due to her failure to exhaust the EEOC administrative process.  (Docket No. 64, p. 7-11).  To show that Lugo's claims were not timely filed in this court, defendants have submitted Lugo's two EEOC charges and a response from the EEOC.  (Docket Nos. 64-1, 64-2).  The court will not convert defendants' Rule 12(b)(6) motion into one for summary judgment by incorporating matters outside the pleadings, <u>see</u> Fed. R. Civ. P. 12(d), particularly since defendants have filed a separate motion for summary judgment.  (Docket No. 154).  However, the correspondence between Lugo and the EEOC is incorporated by reference in the fifth amended complaint, so the court may consider the exhibits.

Lugo's first EEOC charge, for Title VII retaliation, was filed on January 29, 2009.  It alleges that between March 28, 2008 and January 12, 2009, defendants retaliated against her for participating

in "a female coworker"'s sexual harassment investigation by issuing her frivolous disciplinary memoranda, culminating in her termination on the pretext that the department in which Lugo worked was closing.  (Docket Nos. 64-2, p. 2; 87-1).  Lugo filed a second EEOC charge on March 29, 2010, alleging sex-based discrimination and retaliation under Title VII through her termination and through hostile treatment by Torres for rejecting his advances, by Cruz for reporting Torres, and by the Hospital's management for being a witness in González's harassment investigation.  She entered only one date when the discrimination took place: January 12, 2009, the day of her termination. (Docket No. 64-2, p. 1).  On April 26, 2010, the EEOC issued Lugo a letter stating that it was closing its file on the March 2010 charge because it had not been timely filed.  (Docket No. 64-1, p. 1).

Title VII states in pertinent part that a charge "shall be filed" with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred," or within 300 days if "the person aggrieved has initially instituted proceedings with [an authorized State or local agency."[3]  42 U.S.C. § 2000e-5(e).  A plaintiff "who seeks to recover for an asserted violation of Title VII, first must exhaust administrative remedies by filing a charge with the EEOC . . . within the prescribed time limits," and failure to do so, "if unexcused, bars the courthouse door, as courts have long recognized that Title VII's charge-filing requirement is a prerequisite to the commencement of suit."  Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999) (citations omitted).

As explained by the EEOC, Lugo did not timely file her claims for sex-based discrimination and for retaliation due to reporting the alleged sexual harassment.  Plaintiffs did not timely oppose defendants' motion, and the complaint "does not allege any facts that remotely suggest a plausible basis" for excusing Lugo's untimely filing.  Bonilla, 194 F.3d at 278-79.  Accordingly, the court is barred from entertaining Lugo's Title VII claims for sex discrimination and for retaliation due to

---

[3] There is no allegation in the fifth amended complaint that Lugo filed a charge with Puerto Rico's anti-discrimination agency.

reporting her alleged harassment, which therefore should be **dismissed with prejudice**.

Lugo timely filed her January 29, 2009 charge for retaliation based on her alleged assistance in another sexual harassment investigation.  However, defendants argue that Lugo's allegations are insufficient to state a Title VII claim of retaliation on this ground.  (Docket No. 64, p. 23).  Title VII prohibits retaliation against an employee for having "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the statute.  42 U.S.C. § 2000e-3.  To survive dismissal, Lugo must allege that she participated in an investigation under Title VII and suffered an adverse employment action due to her participation.  Fantini, 557 F.3d at 32.

I find that Lugo has sufficiently alleged that she was retaliated against for assisting in the internal investigation of González's sexual harassment complaint against Torres.  Lugo alleges that after she told Torres she would "tell the truth" about his treatment of González, Torres and Cruz began "a campaign" against her, yelling at her constantly, giving her memos about fabricated incidents of absenteeism, and interfering with her professional development activities (namely, seminar attendance and license renewal).  Cruz called her a bitch and said whoever messed with Torres had to mess with him, new duties were added to Lugo's position, and García avoided Lugo and sided with the supervisors.  Lugo also alleges that after she submitted her complaint letter about Torres and Torres was terminated, nobody would speak to her, Cruz and García threatened Lugo's job for working too much overtime, Cruz isolated Lugo from her coworkers, and Lugo was ultimately discharged, and she suspected her treatment was all due to her participation in González's investigation.  Although it remains to be seen whether Lugo can amass enough competent evidence to survive summary judgment, these allegations are sufficient to make out a plausible claim of Title VII retaliation for participating in an investigation.  See Iqbal, 129 S.Ct. at 1949-50.  Accordingly, I recommend that the court **deny** defendants' motion to dismiss this claim.

**C.     González's Claims**

Next, defendants argue that González has not plausibly alleged violations of Title VII's

prohibitions against sex discrimination and retaliation.  (Docket No. 64, p. 12-24).  Sexual harassment is an actionable form of sex discrimination under Title VII, Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65-66 (1986), and courts have recognized two distinct theories for sexual harassment claims: "*quid pro quo*" and "hostile work environment."  Equal Emp't Opportunity Comm'n v. Horizons Hotel Corp., 831 F. Supp. 10, 13 (D.P.R. 1993) (citations omitted).  González alleges claims of sexual harassment on both hostile work environment and *quid pro quo* theories, and of retaliation for reporting the sexual harassment.

## 1.   Hostile Work Environment

González alleges that she was subjected to a hostile work environment on account of her sex. A hostile work environment is one where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  Such a claim comprises "a series of separate acts that collectively constitute one unlawful employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (quotation omitted).  Defendants contend that the incidents that González alleges occurred in November and December 2006 are time-barred because they fall outside the Title VII filing period for administrative charges, and that as to the year 2007 onward, González has not plausibly alleged a hostile work environment due to sex.  (Docket No. 64, p. 12-21).

Under Title VII, a plaintiff must file a discrimination charge with the EEOC within 300 days of the alleged discrimination.  42 U.S.C. § 2000e-5(e)(1).  A plaintiff generally cannot litigate claims based on conduct falling outside of this period.  Alvarez v. Delta Airlines, Inc., 319 F. Supp. 2d 240, 246 (D.P.R. 2004).  However, under a hostile work environment theory, the entire period of the hostile environment may be considered for the purposes of determining liability so long as an act contributing to the claim occurs within the filing period.  Id. at 246-47 (citing Morgan, 536 U.S. at 104).  The plaintiff thus must plausibly allege sufficient activity to make out an actionable hostile work environment practice that includes at least one act within the statutory time period. Morgan,

536 U.S. at 120; Malone v. Lockheed Martin Corp., 610 F.3d 16, 22 n.12 (1st Cir. 2010).  González first filed an EEOC charge on August 8, 2008 (see Docket No. 68-13), so, in addition to plausibly alleging a hostile work environment, González's claim must also include at least one act that occurred after October 13, 2007.

To state a Title VII hostile work environment claim, a plaintiff must sufficiently allege that as a member of a protected class, she was subjected to unwelcome, gender-based harassment that was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment and that was both objectively and subjectively offensive, and that the employer is liable for the misconduct.  Aponte-Rivera v. DHL Solutions (USA), Inc., ___ F.3d ___, 2011 WL 2027977, at *2 (1st Cir. May 25, 2011) (hereafter Aponte-Rivera) (citing Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 15 (1st Cir. 2007)).  Defendants contend that González has not plausibly alleged the Hospital's liability, nor that her harassment was based on sex and was sufficiently severe and pervasive to qualify as a hostile work environment.

To give rise to a cognizable discrimination claim under Title VII, the hostile conduct alleged must have been directed at the plaintiff because of a characteristic protected by Title VII (here, sex).  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998) (Title VII is not "a general civility code" for the workplace); Quiles-Quiles v. Henderson, 439 F.3d 1, 7-8 (1st Cir. 2006) (citations omitted).  Defendants argue that plaintiff's supervisors' inquiries into her work performance and enforcement of workplace rules cannot plausibly be deemed motivated by sex-based animus.  (Docket No. 64, p. 15-16)  However, defendants fail to mention Torres's requiring the MRI technologist to remove González's shirt and bra when he was conducting the head MRI study without plaintiff's knowledge.  This single act, which occurred in March 2008, is sufficient to act as a "hook" for the conduct that would otherwise be time-barred from consideration.  See Morgan, 536 U.S. at 120.

As to the time period before October 2007, González alleges that in late 2006, Torres "peeped" at González after shutting her in his office with him, told her she could be his secretary,

asked her out, said he wanted to kiss her, told her she should be afraid to go to his office alone, and flirted with her about the clothes she planned to wear to a softball game.  It is entirely plausible that these harassing incidents were gender-based.  Additionally, Cruz called Lugo a bitch in early 2007 in front of González, and Vázquez, who allegedly knew of and tolerated Torres's sexual harassment of González, made a comment to González in May 2009 about bringing in Torres to make González laugh.  Although it is a close call, the court infers in González's favor that gender-based animus motivated these acts; whether González can prove actual discriminatory animus is an issue better addressed on summary judgment.

These allegations, together with the MRI incident in March 2008, thus must constitute sufficient activity to be actionable under Title VII.  See Malone, 610 F.3d at 22 n.12.  To be actionable, the discriminatory harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris, 510 U.S. at 21.  The court examines all the circumstances in order to make this determination, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 23.

Here, while the incidents of sex harassment are relatively few and far between, and while it remains to be seen whether they will be supported by competent evidence, I find the allegations sufficient at this stage to withstand a motion to dismiss.  Arguably, it was humiliating for Torres to lock González in his office and stare at her, and the comment that she should be afraid to go to his office alone, while only an utterance, is threatening nonetheless.  The MRI incident is particularly humiliating due to the exposure of González's breasts and the air of voyeurism about the circumstances.  Furthermore, the harassment interfered with González's work performance to the extent that she could not work: she alleges that Torres's sex harassment physically affected her so much that she was treated at the Hospital's ER on multiple occasions, took several days off sick because of anxiety attacks, and ultimately was reported to the SIF for several months.  Therefore,

I find that González sufficiently alleges that the sex-based harassment to which she was subjected was sufficiently severe and pervasive to create a hostile work environment.

As to employer liability, employers are vicariously liable for a supervisor's "severe and pervasive" harassment where it culminates in a tangible employment action. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). A "tangible" action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Id. at 761. Torres was González's supervisor, and she alleges that his harassment grew so bad that she had to take several months off work while being treated at the SIF. I find that this qualifies as a tangible employment action, and therefore González has sufficiently alleged a Title VII hostile work environment claim. Accordingly, I recommend that the court **deny** defendants' motion to dismiss this cause of action.

> ### 2.    *Quid Pro Quo*

González also alleges *quid pro quo* sexual harassment against Torres. Under this form of harassment, "an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the subordinate's employment." O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001); Hernández-Loring v. Universidad Metropolitana, 233 F.3d 49, 52 (1st Cir. 2000). To state a claim, a plaintiff must plausibly allege that as a member of a protected group, she was subjected to unwelcome, sexually-motivated advances, her reaction to the supervisor's advances affected a tangible aspect of her employment, and the employer is liable for the harassment. Acevedo Vargas v. Colon, 68 F. Supp. 2d 80, 90 (D.P.R. 1999). The plaintiff's reaction must "affect[] tangible aspects of [her] compensation, terms, conditions, or privileges of employment." García v. V. Suarez & Co., 288 F. Supp. 2d 148, 158 (D.P.R. 2003) (citation and quotation omitted).[4]

---

[4] In this way, the courts have distinguished *quid pro quo* claims from hostile work environment claims, drawing a "distinction between cases involving a threat which is carried out and offensive conduct in general"; where a "claim involves only unfulfilled threats, it should be categorized as a hostile

A "tangible" action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Ellerth, 524 U.S. at 761.

Here, the first three *quid pro quo* elements are clearly met, so it remains for González to plausibly allege that the Hospital is liable for tangible effects on her employment due to her rejection of Torres's overtures. González alleges that in November 2006, she turned down Torres when he asked her to go out with him and said he wanted to kiss her. Subsequently, Torres, either directly or through Cruz, closely monitored her and isolated her in her office, added functions to her job duties in February 2008 with no training or pay increase, and sent letters to HR criticizing her job performance while she was reported to the SIF. Torres also threatened to and/or did discipline González for allegedly showing disrespect, not scheduling leave through him, not following his instructions, and mistakes in her work (including errors attributable to others), making her fear he would get her fired. Finally, she alleges that Torres's harassment affected her physically to the extent that she had to take several months off work for treatment at the SIF.

I find that González has plausibly alleged that her rejection of Torres's come-ons resulted in a tangible change in her employment conditions through isolation, increased job duties, and unjustified disciplinary actions, culminating in her physical illness and sick leave while reported to the SIF. Furthermore, because González has alleged that her supervisor's sexual harassment of her resulted in a tangible employment action, I find that she has plausibly alleged that the defendant Hospital is liable for the supervisor misconduct alleged. Twombly, 550 U.S. at 556; Valentin-Almeyda, 447 F.3d at 95 (citation omitted) (summarizing rules for employer liability for supervisor harassment). Accordingly, I recommend that the court **deny** defendants' motion to dismiss González's Title VII *quid pro quo* claim.

---

work environment claim" rather than as a *quid pro quo* claim. Ellerth, 524 U.S. at 753-54 (citing Oncale, 523 U.S. at 81; Harris, 510 U.S. at 21)).

### 3.      Retaliation

Finally, González alleges that Torres, García, and Cruz, as well as Martínez and Pabón, retaliated against her for complaining about Torres's alleged sexual harassment. (Docket No. 108, ¶¶ 67, 70, 71, 76, 77, 81, 83, 84, 86, 87, 88n, 89). To state a retaliation claim, a plaintiff must plausibly allege that she suffered an adverse employment action that was caused by her engagement in protected conduct. Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). Protected conduct includes complaining to one's supervisors as well as the filing of administrative complaints. Benoit v. Technical Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003). To be adverse, an employment action "must materially change the conditions" of the plaintiff's employment; examples include "disadvantageous transfers or assignments" and "unwarranted negative job evaluations." Gu, 312 F.3d at 14 (citation and quotation omitted). Defendants contend that González has not plausibly alleged that she suffered an adverse employment action. (Docket No. 64, p. 21-24).

Although defendants concede that González's August 2008 EEOC charge was protected conduct (Docket No. 64, p. 22-23), González also made several internal complaints about Torres's sexual harassment of her in November and December 2006 and in March and April 2008, culminating with a memo to García, Martínez, and Pabón that outlined Torres's harassing acts. As to adverse actions, González alleges that after Torres was terminated, García and Cruz retaliated against her by giving her negative remarks and looks, keeping her later than others on Christmas Eve 2008, issuing her memos about medical certificates after she took sickness or injury leave, blaming her for others' sub-par work, throwing papers on her desk, and allowing her coworkers to yell at her. While pregnant, González was not allowed to choose her own maternity wear or to eat at work. Finally, González alleges that she was terminated in November 2010, after being deposed in the instant case, because of her claims against Torres. I find that González has plausibly alleged that she suffered adverse employment actions for complaining about Torres's harassment of her. See Gu, 312 F.3d at 14. Therefore, I recommend that the court **deny** defendants' motion to dismiss González's claim for Title VII retaliation.

*González Santos, et al.* **v.** *Torres Maldonado, et al.*                                                    Page 30
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

**IV.    Puerto Rico Law Claims**

In addition to their Title VII claims, plaintiffs also allege several causes of action under Puerto Rico's anti-discrimination and tort laws.  Plaintiffs bring suit under Puerto Rico's general tort statute, Article 1802, and its associated *respondeat superior* statute, Article 1803.  Additionally, although they do not enumerate the statutes by name,[5] plaintiffs bring claims under Law 100, the general employment discrimination statute; Law 69, which proscribes gender-based employment discrimination; Law 17, prohibiting sexual harassment in the workplace; and Law 115, forbidding workplace retaliation.  (Docket No. 108, ¶ 132).  Defendants argue that plaintiffs' Puerto Rico law claims should be dismissed.

**A.    Laws 17, 69, and 100**

Defendants argue for the dismissal of both plaintiffs' claims under Laws 17, 69, and 100. As to plaintiff Lugo, defendants contend that her claims under these laws are time-barred.  (Docket No. 64, p. 11-12).  Law 100 has a one-year limitations period, which the courts have also applied to Law 69.  Rodríguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 60-61 (1st Cir. 2005) (citations omitted).  Law 17's limitations period is one year as well.  29 L.P.R.A. § 155m.  The filing of an EEOC charge may, with restrictions, toll the running of the limitations period for these laws. Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 102 n.20 (1st Cir. 2006); Rodriguez-Torres, 399 F.3d at 60-61 (citing 29 L.P.R.A. § 150).

Lugo was terminated on January 12, 2009.  Her first EEOC charge mentions only retaliation and thus invokes only Law 115.  She filed her second EEOC charge, alleging gender-based employment discrimination, workplace sexual harassment, and retaliation, on March 29, 2010. (Docket No. 64-2).  Since the second EEOC charge itself was filed more than one year after Lugo's

---

[5] The fifth amended complaint states that defendants are liable "under the special labor laws of Puerto Rico that prohibit discrimination at the workplace, particularly discrimination based on gender and as well [sic] any and all Puerto Rico legislation granting a cause of action for reprisals suffered by a 'whistleblower' of personnel and work related incidents of discrimination and harassment."  (Docket No. 108, ¶ 132).

termination, it cannot toll the running of the limitations period.  Therefore, the court should **dismiss with prejudice** Lugo's Law 17, 69, and 100 claims.

Defendants also argue for the dismissal of González's state-law discrimination claims.  The substantive law under Laws 17, 69, and 100 generally follows that of Title VII.  See Hernandez-Loring, 233 F.3d at 56 ("the substantive law of Puerto Rico on sexual harassment appears to be aligned with Title VII law, and Title VII precedents are used freely in construing commonwealth law.").  The chief distinction is that unlike Title VII, Law 17 "expressly allows for individual liability." Valentin-Almeyda, 447 F.3d at 101 (citing 29 L.P.R.A. §§ 155a, 155d, 155j).  Likewise, Law 69 also supports individual liability.  Gerald v. Univ. of P.R., 2010 WL 1133856, at *3 (D.P.R. Mar. 22, 2010) (citing Huertas-González v. Univ. of P.R., 520 F. Supp. 2d 304, 316 (D.P.R. 2007)).  And Law 100 imposes personal liability on the supervisor who actually commits the acts of discrimination or sexual harassment.  Rivera Maldonado v. Hosp. Alejandro Otero Lopez, 614 F. Supp. 2d 181, 197 (D.P.R. 2009) (construing Rosario Toledo v. Distribuidora Kikuet, Inc., 151 P.R. Dec. 634 (2000)).

For the same reasons discussed *supra* with respect to Title VII, I find that González has plausibly alleged that her supervisor, Torres, sexually harassed her and thus should be held personally liable for the misconduct alleged.  Accordingly, she has sufficiently stated a claim under the sexual harassment-specific statute, Law 17, as well as the general and gender-specific anti-discrimination statutes, Laws 69 and 100 (respectively).  See Vargas v. Fuller Brush Co. of P.R., 336 F. Supp. 2d 134, 142-43 (D.P.R. 2004) (individual defendants who are supervisors and whose own actions of sexual harassment violate plaintiff's rights are indeed liable under Law 100, as well as Laws 69 and 17).  The court should therefore **deny** González's claims against Torres under these statutes.

As to Torres's conjugal partnership, while an individual may be liable under Laws 17, 69, and 100, the individual's acts of sexual harassment do not benefit the conjugal partnership, so a conjugal partnership does not respond for the damages caused by one of the partners who commits

sexual harassment. <u>Kikuet</u>, 151 P.R. Dec. at 648; <u>see also</u> <u>Rivera-Garcia v. Sprint PCS Caribe</u>, 2010 WL 3123296, at *8 (D.P.R. Aug. 9, 2010) (citing <u>Kikuet</u>). Thus "the proper stage wherein to include the responsible party's spouse in representation of the conjugal partnership is the execution of judgment stage once, and if, the sued spouse is found responsible for the alleged wrongdoing pursuant to Puerto Rico anti-discrimination laws." <u>Rivera-Garcia</u>, 2010 WL 3123296, at *8 (citing <u>Mejias Miranda v. BBII Acquisition Corp.</u>, 120 F. Supp. 2d 157, 172 (D.P.R. 2000)). Therefore, González's claims against Torres's conjugal partnership with his spouse under Laws 17, 69, and 100 should be **dismissed without prejudice** at this juncture.

Torres is just one of half a dozen individual defendants named in the instant case. Defendants contend that González's claims under Laws 17, 69, and 100 should be dismissed as against individual defendants Cruz, Pabón-Quiñones, Pabón, Vázquez, and García, and their respective conjugal partnerships. Defendants argue that González has not alleged discrimination or sexual harassment by any of these individuals. (Docket No. 64, p. 6-7). There are no allegations that Pabón-Quiñones, Pabón, Vázquez, or García held supervisory roles over González. Since personal liability lies only against the supervisor who authored the harassment or discrimination, <u>Rivera Maldonado</u>, 614 F. Supp. 2d at 197, González's claims under Laws 17, 69, and 100 should be **dismissed** with regard to these defendants and their conjugal partnerships.

As to Cruz, it is clear that he, not just Torres, was González's supervisor. González has not plausibly alleged that Cruz ever sexually harassed her himself, only that he tolerated his superior Torres's sexually harassing acts. But unlike Laws 69 and 100's broad bans of discriminatory conduct, Law 17 is directed at sexual harassment in particular, so González's Law 17 claims against Cruz and his conjugal partnership should be **dismissed**. As to Laws 69 and 100, the Puerto Rico Supreme Court's decision in <u>Kikuet</u> did not restrict individual liability under Law 100, which is a general anti-discrimination statute, to claims of sexual harassment. <u>See</u> <u>Otero-Merced v. Preferred Health Inc.</u>, 680 F. Supp. 2d 388, 392 n.5 (D.P.R. 2010). And Law 69, which prohibits gender-based discrimination, is likewise amenable to individual liability for a supervisor's acts that, while not

sexually harassing, are nonetheless discriminatory.  Diaz-Rivera v. El Dia, Inc., 2005 WL 2333645,
at *3 (D.P.R. Sept. 23, 2005) (construing Kikuet).  Accordingly, Cruz may be individually liable
under these two laws so long as González has sufficiently alleged that he discriminated against her
because she is female.

González alleges that on Torres's orders, Cruz made González keep her office door closed,
closely monitored her comings and goings, and once called Torres to report her "problematic"
behavior.  Cruz made her sign a disciplinary memo about erroneous reports that were not her work,
and on another occasion, Torres had Cruz sign another memo which González refused to sign.  Cruz
said it was "like sabotage" when she bumped his desk with a cart and then argued with her about a
patient's x-ray results, and he once called Lugo a bitch in front of González.  Cruz, along with Torres
and García, once induced González to take a lunch break before she was ready, and she suspected
Cruz and Torres discussed her job performance in front of other employees.  When she was
prescribed a five-day medical leave for anxiety attacks due to Torres's alleged harassment, Cruz tried
to get her treating doctor to change his diagnosis.  After Torres was terminated, Cruz apologized to
González and said he could not do anything about Torres's behavior, which he said he had tried
unsuccessfully to report to HR.

I find González has not sufficiently alleged that Cruz discriminated against her due to sex.
Most of Cruz's alleged conduct consists of what may at most be deemed aiding and abetting the acts
Torres allegedly took in retribution for being spurned by González.  Since only the supervisor who
actually engages in the harassing acts is individually liable for them, e.g., Vargas, 336 F. Supp. 2d
at 142-43, Laws 69 and 100 do not permit the imposition of liability through so attenuated a
connection to unlawful acts.  And the acts Cruz took independent of Torres's influence, such as the
"like sabotage" incident, cannot plausibly be deemed discriminatory.  While calling Lugo a bitch in
front of González may help make out a hostile work environment claim, such a stray comment,
standing alone, is insufficient to amount to a violation of Law 69 or 100 – particularly as it was not
directed at González.  See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (stray

workplace remarks cannot show discriminatory animus).  Moreover, Cruz's own allegation that he tried to report Torres further undermines the plausibility of the claim that Cruz discriminated against González.  Accordingly, the Law 69 and 100 claims against Cruz and his spouse and conjugal partnership, like the Law 17 claim, should be **dismissed**.

**B.     Law 115**

In addition to their Title VII retaliation claims, both plaintiffs allege retaliation under Law 115, which prohibits discrimination against employees for offering testimony before a legislative, administrative, or judicial forum. 29 L.P.R.A. § 194a.  Law 115 allows for individual liability of a supervisor who retaliates against an employee.  Rosario Garcia v. Bd. of Trs. of Royalty Fund & Mechanized Cargo ILA 1575, 2010 WL 5095421, at *6-*7 (D.P.R. Sept. 3, 2010) (citations omitted); Reyes-Guadalupe v. Casas Criollas, 597 F. Supp. 2d 255, 260 (D.P.R. 2008) (citing Hernández v. Raytheon Serv. Co. P.R., 2006 WL 1737167 (D.P.R. Apr. 26, 2006)).  Since defendants' only mention of this claim improvidently presupposes the dismissal of all federal law claims (Docket No. 64, p. 26), it remains for the court to determine for itself whether the Law 115 claims may go forward.[6]

As to defendant Hospital, for the same reasons discussed above with regard to Title VII, I find that plaintiffs have sufficiently alleged that they were retaliated against – González for complaining about Torres's harassment, Lugo for participating in González's complaint. See Rojas-Ramirez v. BMJ Foods, Inc., 2011 WL 693621, at *12 (D.P.R. Feb. 24, 2011) (citations omitted) (court applies same analytical framework to Law 115 claims as to Title VII retaliation claims). Accordingly, I recommend that the court **deny** defendants' motion to dismiss plaintiffs' Law 115 claims against defendant Hospital and its insurers.

Likewise, for the reasons discussed above regarding Title VII, I find that González has

---

[6] Given Law 115's three-year limitations period, 29 L.P.R.A. § 194a(b), plaintiffs' claims clearly are not time-barred.

sufficiently alleged that Cruz retaliated against her for complaining about Torres's conduct, and that Lugo has plausibly alleged retaliation by Torres and Cruz for participating in González's complaint. Furthermore, I find that González has made out a plausible Law 115 claim for retaliation by Torres himself. After González complained about his conduct (and before he was terminated for it), Torres allegedly issued her disciplinary memos, added more duties to her job functions, and sent memoranda to HR about her alleged performance deficiencies.

Accordingly, I recommend that the court **deny** defendants' motion to dismiss plaintiffs' Law 115 claims against Torres and Cruz. I note that Lugo's Law 115 claims are limited to a "participation" theory only, since, as noted, her Law 115 claims that arise out of her second EEOC charge are time-barred. However, since Torres's and Cruz's retaliatory actions did not benefit their respective conjugal partnerships, plaintiffs' claims against Torres's and Cruz's spouses and conjugal partnerships should be **dismissed without prejudice** for now. Rivera-Garcia, 2010 WL 3123296, at *8; Kikuet, 151 P.R. Dec. at 648. And as mentioned, Pabón-Quiñones, Pabón, Vázquez, and García did not supervise either Lugo or González, so both plaintiffs' Law 115 claims against these individual defendants and their spouses and conjugal partnerships should be **dismissed**.

### C.      Articles 1802 and 1803

Finally, plaintiffs bring claims under Puerto Rico's general tort statute, Article 1802, and its vicarious liability counterpart, Article 1803. Puerto Rico's one-year prescriptive period governing tort actions, see 31 L.P.R.A. § 5298(2), starts running one day after the date of accrual, which is "when the plaintiff knows or has reason to know of the injury which is the basis for his claim." Santana-Castro v. Toledo-Davila, 579 F.3d 109, 114 (1st Cir. 2009) (citations and quotation omitted); Benitez-Pons v. Commonwealth of P.R., 136 F.3d 54, 59 (1st Cir. 1998) (citation omitted). While the prescriptive period may be tolled through various means, 31 L.P.R.A. § 5303, the filing of an administrative charge with the EEOC does not toll the limitations period for Article 1802 and 1803 claims. González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 322 (1st Cir. 2009)

(citations omitted).

        Defendants argue that both plaintiffs' claims under Articles 1802 and 1803 are time-barred:

González's because she filed suit more than one year after the termination of her alleged harasser,

Torres, and Lugo's because she was added as a plaintiff more than one year after her termination.

(Docket No. 64, p. 24-26).  However, regardless of whether plaintiffs' claims are time-barred, they

are not cognizable because they arise from the same facts as their claims under Title VII and Laws

115, 100, 69, and 17.  The provisions of the Civil Code are supplementary to special legislation, so,

to the extent that a special labor law covers the conduct for which a plaintiff seeks damages, she is

barred from using that same conduct to bring a claim under Article 1802 as well.  Rivera-Melendez

v. Pfizer Pharm., Inc., 747 F. Supp. 2d 336, 339 (D.P.R. 2010) (citations and quotations omitted);

Medina v. Adecco, 561 F. Supp. 2d 162, 175-76 (D.P.R. 2008) (citations omitted); Barreto v. ITT

World Directories, Inc., 62 F. Supp. 2d 387, 393 (D.P.R. 1999) (citations omitted).

        Here, plaintiffs allege that defendants' acts and omissions "incurred in willful blindness,

reckless negligence and/or intentional infliction of emotional harm against plaintiffs, recklessly

causing and/or contributing to a hostile work environment, sex discrimination and retaliation."

Accordingly, plaintiffs allege violations of "Articles 1802 and 1803 as well as under the special labor

laws of Puerto Rico that prohibit discrimination at the workplace" and retaliation.  (Docket No. 108,

¶ 132).  Since the only tortious or negligent conduct plaintiffs complain of (*i.e.*, sexual harassment,

discrimination, and retaliation) is prohibited by the "special labor laws" they cite in the same breath

as Article 1802, plaintiffs' additional claims under Articles 1802 and 1803 should be **dismissed with**

**prejudice**.[7]

_____

        [7] No federal claims remain against the individual defendants, and there appears to be no basis for
diversity jurisdiction over them.  (See Docket No. 108, ¶¶ 8-14).  Defendants' arguments for dismissal of
the state-law claims are premised solely on the dismissal of *all* federal claims, without any specific
argument regarding jurisdiction.  The court has supplemental jurisdiction over the remaining state-law

## CONCLUSION

For the foregoing reasons, I recommend that defendants' motion to dismiss be **GRANTED IN PART** and **DENIED IN PART**.  Specifically, I recommend that the court **DISMISS WITH PREJUDICE** (1) both plaintiffs' claims against all defendants under the First Amendment and the FMLA; (2) both plaintiffs' Title VII claims against the individual defendants and their spouses and conjugal partnerships (where applicable); (3) both plaintiffs' Article 1802 and 1803 claims; and (4) all of Lugo's claims, under Title VII and Laws 17, 69, 100, and 115, for discrimination and for retaliation based on reporting her alleged harassment (*i.e.*, all claims arising out of her later EEOC charge).  Additionally, I recommend that the court **DISMISS WITHOUT PREJUDICE** (1) both plaintiffs' claims under Laws 17, 69, 100, and 115 against all individual defendants' spouses and conjugal partnerships (where applicable); (2) González's claims under Laws 17, 69, and 100 against all individual defendants except Torres; (3) González's Law 115 claims against all individual defendants except Cruz and Torres; and (4) Lugo's Law 115 claims against all individual defendants except Cruz and Torres.  I further recommend that the court **DENY** defendants' motion to dismiss (1) Lugo's Title VII claims for "participation"-based retaliation against the Hospital and its insurers; (2) Lugo's claims under Law 115 for "participation"-based retaliation against Torres, Cruz, the Hospital, and its insurers; (3) González's Title VII claims against the Hospital and its insurers; (4)

González's claims against Torres, the Hospital, and its insurers under Laws 17, 69, and 100; and (5) González's Law 115 claims against Torres, Cruz, the Hospital, and its insurers.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court.  Any objections to the same must be specific and must be filed with

---

claims against the individual defendants, as those claims "are so related to [the federal] claims . . . that they form part of the same case or controversy."  28 U.S.C. § 1367(a).

**González Santos, *et al.* v. Torres Maldonado, *et al.***                                      Page 38
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

the Clerk of Court within fourteen (14) days of receipt.  Failure to file timely and specific objections

to the report and recommendation waives the right to appeal.  <u>Henley Drilling Co. v. McGee</u>, 36 F.3d

143, 150-151 (1st Cir. 1994); <u>United States v. Valencia</u>, 792 F.2d 4, 6 (1st Cir. 1986).

   **IT IS SO RECOMMENDED**.

   In San Juan, Puerto Rico, this 1st day of July, 2011.


                                             *S/Bruce J. McGiverin*
                                             BRUCE J. McGIVERIN
                                             United States Magistrate Judge