IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ROSA ANGELA GONZALEZ SANTOS, *et al.*,

**Plaintiff,**

**v.**

ANGEL TORRES MALDONADO, *et al.*,

**Defendant.**

CIVIL NO. 09-1850 (FAB)

OPINION AND ORDER

BESOSA, District Judge.

Before the Court is the Report and Recommendation (R&R) (Docket No. 203), regarding defendant's motion to dismiss the case under Federal Rule of Civil Procedure 12(b)(6) (Docket No. 64), which plaintiffs did not timely oppose.  Having considered the magistrate judge's recommendations, defendants' objections and opposition to plaintiff's objections (Docket Nos. 229 & 239), and plaintiffs' objections (Docket Nos. 230 & 240), the Court **ADOPTS IN PART AND REJECTS IN PART** the Report and Recommendation, (Docket No. 203).

DISCUSSION

I.   Background

A.   Procedural Background

Plaintiffs Rosa Angela Gonzalez-Santos ("Gonzalez") and Brenda Lugo-Caraballo ("Lugo") (collectively, "plaintiffs") brought a workplace sexual harassment and retaliation action against

defendants Instituto Medico del Norte, Inc., d/b/a Hospital Wilma
N. Vazquez ("Hospital"), Angel Torres-Maldonado ("Torres") and his
conjugal partnership, Luis Cruz-Martinez ("Cruz") and his conjugal
partnership, Jose Pabon-Quiñones ("Pabon") and his conjugal
partnership, Eduarda Pabon, Enrique Vazquez, American International
Insurance Company ("American") and Liberty Mutual Insurance Corp.
("Liberty"), (collectively, "defendants"), under Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*,
the Family and Medical Leave Act ("FMLA"), as amended, 29 U.S.C.
§ 2601 *et seq.*, and assorted Puerto Rico laws.  The operative
complaint is the fifth amended complaint, filed by plaintiffs on
March 31, 2011 (Docket No. 108), after defendants had already filed
their motion to dismiss (Docket No. 64).  Plaintiffs filed no
response to the motion to dismiss.

        Pursuant to a referral order issued by the Court,
Magistrate Judge Bruce J. McGiverin filed a report and
recommendation with regard to the defendants' motion to dismiss the
case. (See Docket Nos. 39 & 203.)  The magistrate judge recommends
that the motion be granted in part and denied in part.  (Docket
No. 203.)  Specifically, the magistrate judge recommends that the
Court should dismiss with prejudice (1) both plaintiffs' claims
against all defendants under the First Amendment and the FMLA;
(2) both plaintiffs' Title VII claims against the individual
defendants and their spouses and conjugal partnerships (where

applicable); (3) both plaintiffs' Article 1802 and 1803 claims; and (4) all of Lugo's claims under Title VII and Laws 17, 69, 100, and 115 for discrimination and for retaliation based on her second EEOC complaint.  The magistrate judge recommends that the Court should dismiss without prejudice (1) both plaintiffs' claims under Laws 17, 69, 100, and 115 against all defendants' spouses and conjugal partnerships (where applicable); (2) Gonzalez's claims under Laws 17, 69, and 100 against all defendants except Torres; (3) Gonzalez's Law 115 claims against all individual defendants except Cruz and Torres; and (4) Lugo's Law 115 claims against all individual defendants except Cruz and Torres.  Finally, the magistrate judge recommends that the Court deny defendants' motion to dismiss (1) Lugo's VII claims for "participation" based retaliation against the Hospital and its insurers; (2) Lugo's claims under Law 115 for "participation" based retaliation against Torres, Cruz, the Hospital, and its insurers; (3) Gonzalez's Title VII claims against the Hospital and its insurers; (4) Gonzalez's claims under Laws 17, 69, and 100 against Torres, the Hospital, and its insurers; and (5) Gonzalez's Law 115 claims against Torres, Cruz, the Hospital, and its insurers.  (Docket No. 203.)

### B.   Plaintiffs' Waiver of Objection to Report and Recommendation

Plaintiffs failed to oppose defendants' motion for judgment on the pleadings, instead reserving arguments on the merits of that motion for their objection to the report and

recommendation.  (<u>See</u> Docket No. 41.)  Even had the motion never been referred to a magistrate judge, it is clear that "[a] party's failure . . . to timely oppose a motion in the district court constitutes forfeiture."  <u>Crispin-Taveras v. Municipality of Carolina</u>, 647 F.3d 1, 7 (1st Cir. 2011) (citing <u>Rivera-Torres v. Ortiz-Velez</u>, 341 F.3d 86, 102 (1st Cir. 2003)).  Furthermore, this Court's Local Rules expressly state that by failing to file a timely opposition to a motion, "the opposing party shall be deemed to have waived objection."  Loc.Civ.R. 7(b).

        Although 28 U.S.C. § 636(b)(1)(C) gives parties the right to *de novo* review to specific parts of reports and recommendations to which they properly object, those parties are "not entitled to a *de novo* review of an argument never raised."  <u>See Borden v. Sec'y. of Health and Human Servs.</u>, 836 F.2d 4, 6 (1st Cir. 1987); 28 U.S.C. § 636(b)(1)(C).  Allowing parties to sit on their hands until after a magistrate judge has issued a report and recommendation would severely undermine the utility, and the purpose, of referring motions to magistrate judges.  <u>See id</u>.  Thus, "parties must take before the magistrate [judge], 'not only their best shot but all of their shots.'"  <u>Id</u>. (quoting <u>Singh v. Superintending Sch. Comm.</u>, 593 F.Supp. 1315, 1318 (D.Me. 1984)).  Given plaintiffs' failure to oppose the motion for judgment on the pleadings properly, they have consequently passed on any opportunity to present substantive arguments regarding that motion.

Civil No. 09-1850 (FAB)                                               5

See id.; Crispin-Taveras, 647 F.3d at 7; Loc.Civ.R. 7(b).
Accordingly, the arguments presented in their objections and
suggestions to the report and recommendation (Docket No. 230) and
their supplemental motion to their objections (Docket No. 240) will
not be considered by the Court in this opinion and order.
Defendants' motion to strike plaintiffs' supplemental motion to
their objections to the report and recommendation is therefore
**MOOT.**

   **C.  Factual Background**

        Defendants do not object to the basic factual background
presented in the report and recommendation, but rather challenge
the magistrate's conclusion denying defendants' motion to dismiss
on certain issues, arguing that "some of the facts alluded to in
the R&R were not sufficiently pled by the plaintiffs in their
Complaint as to make their claims facially plausible." (Docket
No. 229 at 3.)  Thus, the Court adopts the following facts as
established by the magistrate judge in his R&R.

        Defendant Hospital is a private hospital located in Vega
Baja employing more than 25 employees during the year preceding the
filing of the complaint.  It is the current or past employer of
plaintiffs and the individual defendants.  Plaintiff Gonzalez is a
secretary at the Hospital's Imaging Department.  Plaintiff Lugo was
a medical technologist at the Hospital until her termination on
January 12, 2009.  Defendant Torres directed the Imaging Department

at the Hospital until his termination on or about April 18, 2008. Garcia is the Hospital's Human Resources ("HR") Manager, Cruz is the supervisor of its Radiology Department, Pabon-Quiñones is an administrator and President of the Hospital's Board of Directors, Pabon and Vazquez are licensed physicians and the major stockholders and owners of the Hospital, and American and Liberty are the Hospital's insurers. (Docket No. 108, ¶¶ 3, 6-12, 15, 114, 124).

## II.  Facts Relevant to Plaintiff Gonzalez

On November 16, 2006, Torres called Gonzalez to his office to take dictation and make notes.  He had music playing and asked her to dance with him.  When she said no, he closed and locked the office door, but unlocked and opened it when she asked.  While they worked, Torres gave her discomfiting looks and told her he needed a secretary and she that could be it.  When plaintiff said her back hurt, he offered her his chair, then started staring fixedly at her.  He asked if she thought he was "peeping" at her; she told him she did not like his look.  Although intimidated, plaintiff did not dare get up because Torres said she had to finish the task.  When Torres had to leave, plaintiff Gonzalez finished the task as he had instructed her.  Later that day, Torres again asked her to come to his office to complete some remaining work, but plaintiff Gonzalez was afraid and insisted on doing the work in her own office. (Id., ¶¶ 21-24.)

The following day, Torres again called Gonzalez to his office. He asked her if she was scared to go to his office alone, telling her, "Since I am here by myself, you should be scared." He suggested that they go out together and said nobody would find out. Gonzalez told Torres he was crazy and that she was married, and he told her to think about it. When she left his office, he called after her that he would like to kiss her. She shouted at him that he was crazy, ran away, and started crying. (Id., ¶¶ 25-26.)

At work the following Saturday, Torres called Gonzalez on the telephone and flirtatiously asked what she was planning to wear to an upcoming employee softball game, namely whether she would wear shorts and what kind of shirt. Plaintiff did not answer, and Torres asked if his words upset her. She said she did not like it and asked him to show her some respect. He asked for the baseball park's address; she said she did not know, repeated that she was not comfortable with his comments, and hung up. (Id., ¶ 27.)

On December 1, 2006, Torres sent Gonzalez a document stating that he had seen people outside their work areas during working hours, that employees could leave their work areas only if their work required it and with his or defendant Cruz's authorization, and that break periods were not an employee right. (Id., ¶ 29.) On December 12, 2006, Cruz began monitoring Gonzalez's breaks and departures from her work area on orders from Torres. On December 15, 2006, Torres gave Gonzalez a memo regarding a report

of improper behavior by a Hospital receptionist and indicated that he would not tolerate such an attitude. Gonzalez checked the report and explained that it was from a time when another secretary was on duty. Gonzalez called Garcia, who had been copied on the memo, and told her they should verify their information before handing out disciplinary memos, but Garcia gave Gonzalez no explanation. (Id., ¶ 30.)

On Torres's orders, Cruz began making Gonzalez keep the door in her work area closed so that she would not interact with nearby coworkers, even though other workers were allowed to leave the door open if they "covered" for Gonzalez in her office. Torres began scolding Gonzalez out loud for minor things and made other workers request permission from the supervisor before they could enter Gonzalez's office. When housekeeping personnel cleaned Gonzalez's office, they had to clean and close the door immediately, making Gonzalez feel as though she were being quarantined. (Id., ¶¶ 32-33.)

On December 20, 2006, Cruz twice monitored Gonzalez's break periods and told Gonzalez that breaks were a privilege which she could not take while there was work to do, although other employees took their breaks without any such admonitions. (Id., ¶ 31.) The following day, Cruz called Torres to report Gonzalez's "problematic" behavior when she took her morning break and ordered Gonzalez's coworker to call and tell Cruz when Gonzalez returned

from her breaks.  (Id., ¶ 34.)  When Gonzalez called Garcia in tears to complain that Torres and Cruz were singling her out for scolding and harassment, Garcia told Gonzalez that Cruz had to follow Torres's instructions.  Garcia had to end the call and said she would call Gonzalez back, but never did.  Later that day, Torres held an all-hands meeting where he re-emphasized the rules about break periods, saying that breaks were a privilege and could not be taken while there was work to do.  While saying this, he looked sternly and directly at Gonzalez.  Torres emphasized that employees had to treat their supervisor Cruz with respect and threatened discipline for insubordination if they did not do so. (Id., ¶¶ 35-36.)

On December 22, 2006, Gonzalez persuaded HR Director Eugenia Martinez to approve her pending five-day vacation request after explaining to Martinez that she feared Torres would deny it. Torres became upset with Gonzalez for not going through the proper channels.  (Id., ¶¶ 37, 67.)  When Gonzalez's husband fell sick on December 26, Gonzalez could not reach Cruz or Torres and had to arrange her time off to care for him with Martinez's secretary, Suheil Montalvo, who told Gonzalez to return on Saturday, January 20, 2007.  When Gonzalez arrived on that date, she learned that Torres believed she was returning on Monday and so had scheduled another worker, who called Torres.  Torres scolded Gonzalez for failing to go through the right channels and told her

that what she had done was an act of insubordination.  Gonzalez explained that Montalvo had told her to return that day, and Torres told Gonzalez to go home and come back on Monday.  Id., ¶¶ 38-41.)

When Gonzalez arrived on Monday, January 22, 2007, Torres gave her a memo noting the return date mixup, reminding Gonzalez that Cruz was her supervisor and was under Torres's direction, and stating that it was an act of insubordination to them both not to use the proper channels.  Torres would not hear Gonzalez's version of what happened, so Gonzalez called Garcia to explain and complain about Torres's conduct.  Garcia said it was a misunderstanding due to lack of communication, which Gonzalez blamed on Torres.  The call ended with Garcia telling Gonzalez that Gonzalez would no longer be scheduled for Saturdays.  (Id., ¶¶ 42-43.)

A year later, on February 8, 2008, Torres added other functions to Gonzalez's duties without providing any training, preparation, or salary increase.  (Id., ¶ 44.)  Four days later, Torres sent Gonzalez a memo, addressed to her and copied to Cruz, noting complaints from doctors and patients about inaccurate medical transcription reports.  The memo said that Torres would not tolerate such mistakes and would take disciplinary measures if they recurred.  Gonzalez denied to Cruz that the memo concerned her work and refused to sign it, but Cruz insisted, so Gonzalez signed it but wrote in that she disagreed with it because she did not do the reports.  Soon after, Torres called Gonzalez to his office and

insisted that Gonzalez was responsible for the reports. Gonzalez
denied it, because report transcription was not part of her duties.
Torres loudly berated her not to shift blame and to accept fault,
until she became so upset she cried. She returned to her office,
looked up the dictation recording at issue, and discovered that
another employee had been at fault. She called Cruz to tell him
Torres had been yelling and blaming her, had Cruz listen to the
dictation so he realized the error, and told him to be sure before
issuing a memo to an employee because such mistaken accusations
were unfair. (Id., ¶¶ 45-47.)

On February 14, 2008, Gonzalez was making rounds delivering
documents in a small cart when a patient asked her if his test
results were ready. She said she was not sure and sent him to
Cruz. While in Cruz's office, she slightly bumped Cruz's desk with
her cart, and Cruz shouted in front of the patient that she had hit
his computer and it was "like sabotage." Cruz did not have the
patient's results and sent him to the Hospital's administration to
ask for them. Cruz then got into an argument with Gonzalez over
what she had told the patient and got Torres involved, who verified
that the patient had picked up his results. Gonzalez told Cruz
that everyone was blaming her for no good reason. (Id., ¶¶ 48-50.)
The following day, Cruz, Torres, and Garcia all induced Gonzalez to
take her lunch break even though she was still finishing up some
reports. (Id., ¶ 51.) On February 22, Torres and Cruz discussed

another employee's job performance with Gonzalez in Torres's office, which made Gonzalez think Torres probably did the same thing with regard to her. (Id., ¶ 52.)

On March 4, 2008, Gonzalez had a pituitary MRI done at the hospital. The female MRI technologist first told her she did not have to remove her shirt for the MRI, but halfway through, she told Gonzalez she had to take off her shirt, bra, and girdle on Torres's orders because they were affecting the study, and Gonzalez found out Torres was the one performing the MRI. Gonzalez became very nervous and panicked, and when the MRI was done she asked Torres why he was there. He said he did it to corroborate that Gonzalez was okay and arrogantly told her that the MRI was negative and to get out of there and go back to work. (Id., ¶ 53.) Gonzalez immediately tried in vain to contact the personnel office. (Id., ¶ 54.) A few minutes later, Torres called Gonzalez to his office, where she arrived to find Cruz as well. Torres started discussing workflow between Gonzalez and another employee in the reception area to which Gonzalez had just recently been assigned. When Gonzalez pointed out that she had just started working in that area, Torres said loudly and arrogantly that he was fed up with Gonzalez's excuses and would take disciplinary measures against her if she did not do what he told her. She said she always did her work and had never received any complaints, and Torres sent her away. (Id., ¶¶ 55-57.)

On March 12, 2008, Gonzalez asked Garcia about the status of
a pending meeting which Torres had mentioned.  Garcia asked what
meeting Gonzalez was referring to, and Gonzalez said "the one
regarding a case we have pending," adding that she had been
requesting a meeting with Garcia for a long time but that Garcia
was never available.  She told Garcia about Torres's harassment,
but Garcia did not hold a meeting that day despite Gonzalez's
repeated requests for one.  (Id., ¶ 58.)  Two days later, Torres
called Gonzalez into his office to scold her for not doing her work
correctly and not showing respect and courtesy to patients and
other employees.  He loudly demanded that she sign a disciplinary
memorandum, which Gonzalez refused to do, so Torres gave the memo
to Cruz to sign and write in that Gonzalez would not sign it.
Gonzalez started crying and having an emotional crisis, and Torres
yelled at her to get out of his office.  (Id., ¶¶ 59-60.)

Dizzy, disoriented, and shaking, Gonzalez made her way to the
emergency room, where she vomited.  She was examined and treated by
the doctor on duty, to whom she described the "sexual and labor
harassment" she was undergoing from Torres and Cruz.  The doctor
prescribed her medication for anxiety and issued a medical
certificate ordering a five-day rest period.  (Id., ¶ 61.)  When
she took the certificate to Cruz, Torres, who was present,
questioned why the doctor had ordered such a long rest period, and
Gonzalez said it was for anxiety attacks due to Torres's sexual

harassment and retaliatory acts toward her, which made Cruz's eyes
go wide.  The treating doctor later told Gonzalez that Cruz tried
to have him change his diagnosis.  (Id., ¶¶ 62-63.)

After spending that weekend depressed and anxious that she
might be fired for rejecting Torres's sexual advances, Gonzalez
went to the State Insurance Fund ("SIF") on March 17, 2008 to apply
for coverage for treatment for work-related injuries.  Two days
later, Torres sent a letter to the HR department alleging work
deficiencies by Gonzalez.  (Id., ¶¶ 64-65.)  When Gonzalez went to
the HR office on March 26, 2008 with the SIF forms which the
employer needed to fill out, Garcia denied any knowledge of any
past incidents of harassment that Gonzalez had told her about and
Gonzalez's attempts to meet with her about such harassment.  (Id.,
¶ 66.)  On April 8, 2008, Gonzalez sent a memorandum to Garcia and
Martinez, copied to Pabon, in which she listed some of the most
recent harassing and retaliatory acts by Torres and requested
prompt attention to the matter.  The memo noted that Gonzalez had
filed a complaint with HR as far back as November 2006 and that she
had repeatedly complained to, and tried in vain to meet with,
Garcia.  (Id., ¶ 67.)

Gonzalez remained reported to the SIF until August 14, 2008.
On her return, she noticed Torres was no longer working at the
Hospital and learned that in her absence, he had issued four
memoranda about her allegedly deficient work performance and

disciplinary violations.   That day, she met with Cruz, who
apologized to her, saying he had to follow Torres's orders and knew
it had been unfair to her but that there was nothing he could do.
She said he could have reported the matter to HR, and Cruz said he
had tried but Garcia refused to meet with him.   Given Cruz's
attitude, Gonzalez felt she was returning to the same hostile
environment she had left, except that the original harasser was no
longer there.  (Id., ¶ 68.)

On December 24, 2008, Garcia authorized personnel from the
departments of records, invoicing, laboratory, physical therapy,
HR, and others to leave early at 3:00 p.m., but Gonzalez was not
allowed to leave until 6:00 p.m.   In a meeting on December 26,
Garcia and Cruz explained that she worked with the public and might
be needed, and only office workers had been authorized to leave.
Gonzalez replied that according to her job description, she was an
office worker too, and that other employees with the same
responsibilities also dealt with the public.   She requested a
written explanation for this discriminatory treatment, which Garcia
denied, using language Gonzalez considered disrespectful and a
continuation of the hostile environment that had originated in
November 2006 with Torres's behavior.  (Id., ¶ 69.)

On January 8, 2009, Gonzalez notified Pabon about the
December 24 and 26 incidents, but still no action was taken. Garcia
and Cruz continued giving Gonzalez negative remarks and looks,

which she perceived as further retaliation for having complained about Torres's sexually harassing behavior.  In late 2008 and on January 11, 2009, when Pabon called the radiology department and Gonzalez answered, Pabon would ask, "Do you still work here?", which Gonzalez took to be a retaliatory gesture insinuating she should be fired from the Hospital.  (<u>Id</u>., ¶¶ 70-71.)   On January 16, 2009, Garcia wrote Gonzalez a memo asking her to submit the reasons why she felt discriminated against, what type of discrimination she meant, and the names of the people causing the discrimination and those who had knowledge of it.  (<u>Id</u>., ¶ 72.)

On May 11, 2009, while Gonzalez was having lunch at the Hospital cafeteria, Vazquez approached her and said she looked very serious and quiet while eating and that he would have to bring Torres in to make her laugh.   Gonzalez took this comment as disrespectful since Vazquez knew about Torres's harassment and tolerated the resulting hostile environment.  (<u>Id</u>., ¶ 73.)

On August 24, 2009, Cruz met with Gonzalez and told her about problems he had with Torres and that at Torres's new workplace he had a similar situation to the one he had at the Hospital. Gonzalez asked Cruz why he, as a supervisor, had allowed Torres's behavior, and he said that HR was never available when he tried to meet with them about those incidents.  He told Gonzalez that he had told her that sooner or later Torres would be discharged from the Hospital.  Gonzalez felt it was an additional burden to know that

managerial staff knew about Torres's harassment and did nothing.
(Id., ¶ 74.)

On October 30, 2009, Gonzalez was in a car accident and was
taken to another hospital's ER.  She was ordered to rest until
November 5, 2009, and her husband called Cruz that evening to tell
him about the accident and that Gonzalez would not return until
November 6.  On that day, Gonzalez went to work and gave Cruz the
doctor's certificate.  He left briefly, then returned and said that
Garcia had asked that Gonzalez provide a copy of the police report
of the accident.  She gave Cruz the police complaint number, but he
insisted that she had to produce the report also.  Later that day,
Cruz gave Gonzalez a memo from Garcia, addressed to all employees,
setting out the requirements for any medical certificate brought in
by an employee.  Gonzalez perceived this memo as retaliation by
Garcia for filing a sexual harassment complaint against Torres.
She told Cruz the memo was disrespectful and discriminatory, and
Cruz said, "Well, you know Mrs. Garcia's work style." (Id., ¶¶ 75-
76.)

Through the beginning and middle of 2010, Cruz kept up a
constant pattern of animosity and bitterness towards Gonzalez,
including throwing papers and files on her desk instead of putting
them in the inbox tray on her desk, which she perceived as
retaliation for pursuing her sexual harassment and hostile work
environment claim.  (Id., ¶ 77.)  In late May or early June of

2010, several x-ray technologists shouted at Gonzalez for sending
a patient over to them for x-rays, and when Cruz did nothing about
it, Gonzalez perceived this as retaliation for filing a claim
against the Hospital, Torres, and him. (Id., ¶¶ 78-81.)  In summer
of 2010, Martinez from HR told Gonzalez, who was pregnant, what
type of maternity uniform she should wear.  When Gonzalez could not
find clothing in the required color, she asked to wear a different
color, but Martinez denied the request.  Gonzalez perceived this as
retaliation since other pregnant secretaries in other Hospital
departments were allowed to choose their own maternity clothing.
(Id., ¶¶ 82-83.)

        From early 2010 up through September 7, 2010, Cruz would not
allow Gonzalez to eat at work and would constantly check on her to
see if she was having breakfast in the office and scold her for
doing so, which she perceived as retaliation.  Gonzalez became ill
and dehydrated in early August 2010 from not being allowed to eat
or take breaks and had to go to the ER.  When she returned to work
on August 10, 2010 after a prescribed three-day rest period, she
was reprimanded near the end of the day by Garcia for coming in on
that day because her medical certificate said her leave was through
August 10.  Garcia told Gonzalez to get a new certificate stating
her leave was up to August 9.  Gonzalez perceived it as retaliation
for HR to wait until the end of the day to tell her this instead of

doing so at the beginning of the day when she delivered the medical certificate. (Id., ¶¶ 84-86.)

From early 2010 onward, Gonzalez had Fridays off and another employee filled in for her. Cruz constantly complained on Mondays about the work allegedly performed by Gonzalez despite knowing she was off on Fridays. When Gonzalez pointed out that another employee was performing the work about which he was complaining, Cruz became quiet and did nothing, and Gonzalez perceived his inaction as more retaliation for complaining about the hostile work environment. (Id., ¶ 87.) On August 24, 2010, Gonzalez suffered a gestational edema, which she blamed on stress and anxiety caused by her work situation, and was ordered to take a two-week rest period. She presented this information in an amended EEOC complaint on September 7, 2010. (Id., ¶ 88.)

On October 12 and 13, 2010, Gonzalez was deposed by defendants' counsel despite being close to her delivery date. Defendants' counsel found that Gonzalez had Torres's Social Security number ("SSN") written on a paper in a binder of documents she brought to the deposition, which she had allowed them to view. She explained that she had obtained the SSN while Torres was still working at the Hospital to give to her case investigator to do a background check on Torres. She never divulged the SSN, nor was it used by her investigator. (Id., ¶¶ 88a-88d.)

On November 10, 2010, Garcia terminated Gonzalez during a short meeting with Gonzalez and the Hospital's Security Director, Machado. Gonzalez, who was still pregnant, was given a discharge letter and a check paying out her Christmas bonus and accumulated vacation time, but not maternity leave. Gonzalez read the letter during the meeting; it stated she was being discharged for repeated noncompliance and for violating confidentiality rules due to divulging and improperly using employee information. She asked Garcia what she had done to violate the rules, and Garcia eventually stated that it was due to the issue of Torres's SSN. Gonzalez signed and dated the letter and told Garcia she disagreed with the reasons Garcia gave and the allegations against her. She went back to her work area, retrieved her things, and left. (Id., ¶¶ 88e-88l.) Gonzalez alleges that her dismissal was in retaliation for complaining about Torres's sexual harassment and that the accusations against her regarding allegedly improper use of Torres's SSN are pretextual and untrue. (Id., ¶¶ 88m-88o.)

## II. Facts Relevant to Plaintiff Lugo

On or about November 2006, at an evening event for the x-ray technologists, Torres, in Cruz's presence, invited Lugo to go to some restaurants at the Dorado beach. She immediately refused. That same month, Torres held a meeting of all Radiology Department clerical and technological personnel, where Torres and Cruz exchanged such objects as condoms, whips, paddles, and pornographic

photos, to the disgust and embarrassment of female employees.  They also photographed the people present, who were mostly female employees, including Lugo.  (Id., ¶ 91.)  In early 2007, Torres showed Lugo and another female employee a picture on his computer of a naked baby with adult genitals, laughed, and asked them if they liked the picture, embarrassing them.  (Id., ¶ 92.)

In early 2007, Torres called Lugo to tell her he had a problem relating to Gonzalez for which he could lose his job.  He wanted to know what Lugo would tell Martinez about Torres's treatment of her if Martinez asked, because he had often seen Lugo and Gonzalez talking together.   Torres asked whether Lugo would file a harassment complaint against him as Gonzalez had done.  Lugo, uncomfortable, replied that if asked about Gonzalez, she would tell the truth, and that their relationship was purely work-related. (Id.)

In early January 2007, Lugo requested permission from Torres to attend a continuing education seminar, but Torres told her he would not let her go because he could not go, and he laughed and mocked her.  (Id., ¶ 93.)  Also in early 2007, when Lugo needed to change clothes at work one day, Torres offered to let her change in his office because the bathroom was occupied.  She refused and said she would wait, and Torres told her she looked very good.  (Id., ¶ 94.)

Ever since Gonzalez filed her sexual harassment complaint against Torres, Torres and other Hospital personnel would make negative comments about Gonzalez, saying she was lying.  At the same time, Torres and Cruz began a campaign against Lugo.  When Lugo told Cruz that Torres was treating her unfairly, Cruz told a secretary who was listening to the conversation that whoever messed with Torres had to mess with Cruz.  (Id., ¶ 95.)  Lugo then tried unsuccessfully to talk to Garcia, who would never take Lugo's calls and was never available to meet with her.  When Garcia finally met with Lugo, she defended Torres and Cruz and downplayed Lugo's complaints about them.  Meanwhile, Torres and Cruz continued to scold and yell at Lugo whenever they could.  Cruz called Lugo a bitch in front of Gonzalez once when Lugo called to ask him a question, saying Lugo knew the answer and was calling just to bother him.  Cruz and Torres began issuing Lugo and her coworker, Aida Nater, false memos about absenteeism.  (Id., ¶ 96.)

In June 2007, Lugo asked Torres if she could take off half an hour for lunch, and he told her she had to take a full hour as required by HR.  Lugo said she had too much work to take a full hour, she had the right to eat, and she would not take a lunch at all.  When she returned to her work area, Torres phoned and shouted that she was being disrespectful; she told him he was the disrespectful one, and he hung up.  (Id., ¶ 97.)

In September 2007, the Hospital opened a hyperbaric chamber department, redecorated the Nuclear Medicine reception area, and installed telephone lines so that Nuclear Medicine personnel, including Lugo, who worked there as a secretary, could take calls from the hyperbaric chamber department.  These changes were made without informing plaintiffs; Cruz said the changes were ordered by engineer Pabon.  In addition to her other duties in Nuclear Medicine, Lugo, who was usually by herself, had to be the hyperbaric chamber department's receptionist, although this was not in her work functions.  (Id., ¶ 98.)

The department's director, Dr. Chinea, became more demanding regarding how secretaries should do their work.  He and his daughter, Pabon's wife, constantly supervised Lugo to make sure she was not talking to anyone for non-business-related purposes, and they called Cruz if she did.  Lugo continued having to perform jobs outside of her work functions and Cruz, Torres, or Garcia would be on her back if she did not do them.  (Id., ¶ 99.)  In Nater's presence, Torres gave Lugo a memorandum for insubordination to a supervisor (which constituted grounds for immediate termination), but Lugo refused to sign it.  Lugo requested a meeting with Garcia, who met with Lugo only after Lugo wrote a letter to Pabon, the Hospital's engineer and administrator. Garcia defended Torres and did not resolve Lugo's problem; she backed up what Torres had said about taking a lunch hour and insisted that Lugo sign the

memorandum.  Lugo said it was unfair and would not sign it, but
Garcia said she would put the memo in Lugo's personnel file
regardless.  (Id., ¶ 100.)

Lugo was out sick from October 15 through 17, 2007, and when
she returned on October 18, Torres gave her a memorandum listing
all her absences since the start of her employment, including dates
when Lugo had been at work and dates for which she had submitted
medical certificates.  Lugo protested that she could not lose her
job for absences for which she had medical certificates.  Cruz and
Torres corralled Lugo in the x-ray office, one in front of her and
one behind her, and insisted that she sign the memo.  Lugo felt
physically threatened and afraid, so she signed it.  (Id., ¶¶ 101-
02.)

On or about November 2007, the fumes from a paint job under
way in the Nuclear Medicine area were making Lugo and Nater sick,
but Cruz would not let them leave the department without
authorization by phone from Torres, who was out of the area at the
time.  When Lugo could not stand it anymore and told Cruz by phone
that she was leaving, he came to her office and yelled furiously
for her to sit down, but then took Lugo and Nater to another area.
(Id., ¶ 103.)

Torres suspended Nater on January 28, 2008.  (Id., ¶ 104.)
The next day, Lugo asked permission from her supervisors to go to
the examining board the following day, January 30, in order to

renew her professional license.   Those announced absences were considered normal and were either treated as part of the work day or charged to vacation time.   Torres and Garcia would not allow Lugo either option, however, so she lost eight hours' pay for January 30.   Lugo learned that day that Torres had let other Hospital personnel go renew their licenses without losing pay. (Id., ¶ 105.)

On February 1, 2008, the Nuclear Medicine equipment malfunctioned, and Cruz came and stood by Lugo and told her in a hostile and arrogant manner to try to fix the machine.   Lugo told him she did not know how.   Cruz got upset and called a repair company, Alfa, to inform Lugo by phone how to fix it, but an Alfa employee who happened to be at the Hospital came by and resolved the problem.   (Id., ¶ 106.)

Lugo came down with dengue fever on March 25, 2008, and left work at noon.   She went to a medical office complex in Arecibo to pick up her lab results.   While there, she stopped by Arecibo Radiology, where she had formerly worked, to say hello to her old coworkers.   While she was there, somebody called and asked for her, but hung up when Lugo got on the phone.   Lugo thought nothing of the incident, but Torres later alleged falsely that Lugo was moonlighting at Arecibo Radiology.   (Id., ¶¶ 108-09.)

After returning from her suspension, Nater was constantly assigned to work in another area, leaving the Nuclear Medicine

department without a secretary, so Lugo had to cover for her. Torres fired Nater on Friday, March 28, 2008, while Lugo was still out sick.  He gave Nater's position to another employee and took away Lugo's keys to give to that employee. (Id., ¶ 107.)  The same day, March 28, a coworker, Miguel Aponte, called Lugo to tell her Torres was saying he would fire Lugo when she got back from her absence.  Lugo got nervous, called the Hospital in tears, and spoke with an administrator, Vilar, who tried to calm her down and promised her an explanation when she returned to work.  Lugo ended up going to the ER at another hospital in Arecibo, where she was treated and prescribed antidepressants for her condition.  (Id., ¶ 109.)  On March 30, 2008, Aponte called Lugo and told her Torres had been saying he was going to fire Lugo for giving him a false medical certificate when in fact she was working at Arecibo Radiology.  Lugo called HR, but no one answered, so she called Administration and spoke with Vilar, who again tried to calm her and said she was owed an explanation.  (Id., ¶ 110.)

Upon Lugo's return to work, nobody would say anything to her. Three days after Lugo's return, Martinez asked Lugo to write out all the incidents related to Torres, and she did so.  Days later, Torres was terminated.  Two days after that, the Hospital conducted a training for supervisors and administrators on how to treat employees and avoid complaints.  Lugo began to suppose that her situation was due to her participation as a witness in Gonzalez's

case.  It made her tense, and because Vilar had not yet provided
the promised explanation, she wrote to Pabon.  (Id., ¶¶ 111-112.)
The next day, Martinez and Garcia met with Lugo in Martinez's
office, where they questioned her about every incident in her
complaint letter about Torres.  Garcia denied that she had avoided
meeting with Lugo or that Lugo had ever notified her about problems
with Torres.  Martinez told Lugo that from then on, Martinez, not
Garcia, would handle Lugo's complaints.  (Id., ¶ 113.)  On
April 18, 2008, Montalvo told Lugo that Garcia had told Montalvo
that Torres had been discharged because of Lugo's complaint and HR
personnel had read pieces of Lugo's letter to him.  (Id., ¶ 114.)

     Soon after Torres's termination, Cruz apologized to Lugo for
everything that had happened and told her that his actions against
her were all on Torres's orders.  Cruz told her they would start
over, but by May 2008, he started treating Lugo in a hostile
fashion again, telling her she was working too much overtime and
that Garcia could not accept Lugo's extra hours.  Garcia met with
Lugo soon after and warned that if Lugo did not lower her extra
hours, she risked losing her job because the Hospital had financial
problems and Lugo had to avoid wasting money.  Lugo tried to
explain to Cruz and Garcia that her overtime was necessary,
particularly because Lugo was by herself with numerous duties to
perform.  (Id., ¶¶ 115-16.)

Around late July or early August 2008, Lugo learned that two male Hospital employees were gossiping that Lugo was having an affair.  Lugo told Cruz that she would not stand that type of comment, and Cruz said he would not let any man go to Lugo's office if he was not there.  (Id., ¶ 117.)

In August 2008, Lugo told Cruz that her eyes were hurting and she needed to go to the Hospital's ER, but Cruz made her finish her work first.  The treating doctor at the ER, Dr. Torres, diagnosed conjunctivitis and gave her a medical certificate for five days' leave because her condition was contagious.  Dr. Torres's secretary told Lugo days later that Cruz and Pabon questioned why Dr. Torres let Lugo off for so long and asked her to change her diagnosis, but Dr. Torres refused.  When Lugo returned, the harassment increased. Lugo's coworker, Aurely Alvarado, was forbidden to speak to Lugo; and both Lugo and Alvarado were forbidden to get up from their desks without telling Cruz.  The office's temperature was fixed at 60 degrees, making it too cold to work.  (Id., ¶¶ 118-19.)  All this caused Lugo more tension; she could not go to work unless she took a relaxant or natural remedies to be calm.  (Id., ¶ 120.)

Cruz did not allow Lugo to have breakfast at work or have her coworkers bring her breakfast, or else he would get upset.  He isolated Lugo so nobody could talk to her, even if, for example, janitorial staff needed to repair something in her area.  If Cruz went to Lugo's work area and found someone else there, he would get

upset, shout at her, and slam the door when he left.  He would monitor her when she arrived and during her coffee breaks, and forbade her from going to the cafeteria with Alvarado or any other employee.  (Id.)

The Hospital had agreed to pay for Lugo to attend an annual nuclear medicine convention, but when she requested compensation for the 2008 convention, Garcia denied remembering any such agreement.  In the end, Garcia threw down a check for $100 on Lugo's desk, saying that was all she could give Lugo.  When Lugo asked how she could forget the agreement when the Hospital had paid for previous years, Garcia left angrily.  (Id., ¶ 122.)

In December 2008, Lugo was supposed to take her vacation and had accumulated 23 days' vacation time.  After initially refusing to allow Lugo to take her vacation unless she got someone to cover for her, Garcia permitted her to take ten days' leave and return the day before Three Kings Day.  Lugo asked Garcia as a favor to allow her to return after Three Kings Day, and Garcia arrogantly refused.  Lugo asked for an explanation, and Garcia told her she had to begin work.  Lugo returned from vacation to work on January 5, 2009, then had Three Kings Day off.  After working a full day on January 7, 2009, Lugo had strong chest pains and difficulty breathing and went to another hospital's ER.  (Id., ¶¶ 123-24.)  The ER referred Lugo to a cardiologist, who issued a medical certificate for several days so she could get tests done.

(<u>Id</u>., ¶ 124.)   Lugo's test results were inconclusive; she was
diagnosed with hypoglycemia, which she blames on the irregular
schedule of her breaks and lunch periods at the Hospital.  Lugo had
also suffered a panic attack, which she attributes to nervousness
and stress.  (<u>Id</u>., ¶¶ 126-27.)

On Saturday, January 10, 2009, Lugo received a return-receipt
letter from Garcia discharging her from the Hospital for the stated
reason that the Nuclear Medicine department had been closed.  (<u>Id</u>.,
¶ 124.)  Alvarado was also discharged at the end of her work day on
January 9, 2009.  Lugo was never given any other explanation for
her discharge, and the possibility of the department's closure had
never been mentioned to her.  (<u>Id</u>., ¶ 125.)  Lugo was unemployed
until the end of March 2009.  In August 2009, the Hospital gave
Lugo an offer to return to work as a Nuclear Medicine technologist,
which Lugo refused based on the negative and traumatic experiences
she had undergone in 2007, 2008, and 2009 under the supervision of
Torres and Cruz.  (<u>Id</u>., ¶ 128.)  Neither Lugo nor Gonzalez were
ever informed of their rights and benefits under the FMLA.  (<u>Id</u>.,
¶ 129.)

Plaintiffs allege that Gonzalez and Lugo both complied with
all EEOC procedures, received an EEOC letter authorizing them to
sue, and complied with the time limitations necessary to bring this
action.  (<u>Id</u>., ¶ 1; Docket Nos. 50-5, 64-1.)  After Gonzalez
initially filed suit on August 26, 2009 and amended the complaint

in January 2010 (Docket Nos. 1, 5), the court allowed Lugo to join
as a co-plaintiff (Docket No. 22), and plaintiffs filed the second
amended complaint, adding Lugo's claims, on April 22, 2010.
(Docket No. 23.)  Plaintiffs subsequently filed third, fourth, and
fifth amended complaints to add allegations pertaining to recent
factual developments and to name the defendant insurance companies;
the last amended complaint was filed on March 31, 2011.  (Docket
Nos. 50-6, 75-2, 108.)

Plaintiffs allege that defendants' conduct has harmed their
physical and mental health, requiring medical treatment, and has
had negative effects on their family relationships.  Gonzalez and
Lugo claim punitive damages and compensatory damages, doubled as
applicable under Puerto Rico law, totaling $2.8 million and $2.2
million, respectively.  (Docket No. 108, ¶¶ 137-39.)  Plaintiffs
also request preliminary and permanent injunctive relief against
any further violation of plaintiffs' civil rights or continuation
of the alleged sexual harassment and hostile work environment,
declaratory relief, attorneys' fees, and seniority and back pay for
Gonzalez.  (Id., p. 58-60.)

Plaintiffs allege the following claims, spread across four
causes of action:  (1) sex-based discrimination and retaliation
under Title VII; (2) negligence, intentional infliction of
emotional distress, and vicarious liability under Articles 1802
and 1803 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 5141, 5142;

(3) violation of the Puerto Rico laws against workplace discrimination, harassment, and retaliation, which, while not named by plaintiffs, include Law 100 of June 30, 1959, 29 L.P.R.A. § 146 *et seq.* ("Law 100"), Law 69 of July 6, 1985, 29 L.P.R.A. § 1321 *et seq.* ("Law 69"), Law 17 of April 22, 1988, 29 L.P.R.A. § 155 *et seq.* ("Law 17"), and Law 115 of December 20, 1991, 29 L.P.R.A. § 194 *et seq.* ("Law 115"); (4) violation of plaintiffs' rights under the FMLA; and (5) violation of plaintiffs' First Amendment rights, U.S. Const. amend. I.  (Id., ¶¶ 129-36.)

## III. Legal Analysis

### A.   Standard under 28 U.S.C. § 636(b)(1)

A district court may refer, *inter alia*, "a motion . . . for judgment on the pleadings" to a magistrate judge for a report and recommendation.   See 28 U.S.C. §636(b)(1)(A)-(B); Fed.R.Civ.P. 72(b); Loc. Rule 72(a).  Any party adversely affected by the report and recommendation may file written objections within fourteen days of being served with the magistrate judge's report. See 28 U.S.C. §636(b)(1).  A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made."  Sylva v. Culebra Dive Shop, 389 F.Supp.2d 189, 191-92 (D.P.R. 2005) (citing United States v. Raddatz, 447 U.S. 667, 673 (1980)).  Failure to comply with this rule precludes further review.  See Davet v. Maccorone, 973 F.2d

22, 30-31 (1st Cir. 1992).  In conducting its review, the court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. §636 (a)(b)(1).  <u>Templeman v. Chris Craft Corp.</u>, 770 F.2d 245, 247 (1st Cir. 1985); <u>Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.</u>, 286 F.Supp.2d 144, 146 (D.P.R. 2003). Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object.  <u>See</u> <u>Hernandez-Mejias</u>, 428 F.Supp.2d at 6 (citing <u>Lacedra</u>, 334 F.Supp.2d at 125-126).

**B.   Federal Rule of Civil Procedure 12(c) Standard**

"A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss."  <u>Perez-Acevedo v. Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008) (citing <u>Curran v. Cousins</u>, 509 F.3d 36, 43-44 (1st Cir. 2007)).  When considering a motion under Federal Rule of Civil Procedure 12(c) ("Rule 12(c)"), a "'court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom . . . .'"  <u>Id</u>. (quoting <u>R.G. Fin. Corp. v. Vergara-Nunez</u>, 446 F.3d 178, 182 (1st Cir. 2006)).  "[A]n adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim."  <u>Ocasio-Hernandez v. Fortuño-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011).

When faced with a motion for judgment on the pleadings, "[a] plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." Id. at *9 (quoting Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1950 (2009)).   Any "[n]on-conclusory factual allegations in the complaint [, however,] must . . . be treated as true, even if seemingly incredible." Id. (citing Iqbal, 129 S.Ct. at 1951).  Where those factual allegations "'allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility.   Id. (citing Iqbal, 129 S.Ct. at 1949).

### C.   Defendants' Objections

#### 1.   Lugo's Claims

Defendants object to the magistrate judge's recommendation that this Court deny defendants' motion to dismiss on (1) Lugo's Title VII claims for retaliation based on her participation in Gonzalez's sexual harassment investigation and (2) Lugo's claims under Law 115.  The Court addresses each in turn.

##### a.   Title VII Retaliation

In order for a plaintiff to make out a *prima facie* case of retaliation under Title VII, she must prove that "(1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity." Fantini v.

Salem State College, 557 F.3d 22, 32 (1st Cir. 2009) (quoting

Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 22 (1st Cir.

2002)).  The magistrate judge deemed that Lugo had sufficiently

satisfied these requirements.[1]  Defendants claim that Lugo has not

alleged that she participated in any protected activity, "as she

does not claim she participated . . . in an internal investigation,

thus, she did not 'oppose' discriminatory employment practices (the

opposition clause), nor did she participated [sic] in an

administrative investigation (the participation clause)." (Docket

No. 229 at 7.)

          The magistrate judge's report and

recommendation does not provide a clear analysis of Lugo's claim

for Title VII retaliation.  The Court, on de novo review, finds

that Lugo has sufficiently alleged that she engaged in protected

activity.  "An employee has engaged in activity protected by Title

---

[1] The report and recommendation recites the following facts in support of Lugo's claim for Title VII retaliation:  "Lugo alleges that after she told Torres she would 'tell the truth' about his treatment of Gonzalez, Torres and Cruz began 'a campaign' against her, yelling at her constantly, giving her memos about fabricated incidents of absenteeism, and interfering with her professional development activities (namely, seminar attendance and license renewal).  Cruz called her a bitch and said whoever messed with Torres had to mess with him, new duties were added to Lugo's position, and Garcia avoided Lugo and sided with the supervisors. Lugo also alleges that after she submitted her complaint letter about Torres and Torres was terminated, nobody would speak to her, Cruz and Garcia threatened Lugo's job for working too much overtime, Cruz isolated Lugo from her coworkers, and Lugo was ultimately discharged, and she suspected her treatment was all due to her participation in Gonzalez's investigation." (Docket No. 203 at 23.)

VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." Id. (quoting Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir. 1996). The First Circuit Court of Appeals has specifically noted that "[i]n addition to protecting the filing of formal charges of discrimination, § 704(a)'s opposition clause protects as well informal protests of discriminatory employment practices, including *making complaints to management* . . . and *expressing support of co-workers who have filed formal charges*." Fantini, 557 F.3d at 32 (emphasis added); see also Benoit v. Technical Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003) (finding that plaintiff engaged in protected activity "when he complained to his supervisors about perceived racial discrimination"). Because Lugo alleges that she both submitted a complaint letter about Torres' behavior and voiced her support for Gonzalez's complaints about Torres, Lugo has sufficiently alleged that she engaged in protected activity under Title VII.

Defendants also claim that Lugo's allegations of the adverse employment actions she suffered "lack factual support". (Docket No. 229 at 12.) The First Circuit Court of Appeals has stated that "adverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of

harassment by other employees.'" <u>Marrero</u>, 304 F.3d at 23 (quoting

<u>White v. New Hampshire Dept. of Corrections</u>, 221 F.3d 254, 262 (1st

Cir. 2000)).  Lugo claims that due to her protests about Torres and

Cruz's behavior toward Gonzalez, Torres and Cruz began a "campaign"

against her, yelling at her constantly, giving her memos about

fabricated  incidents  of  absenteeism,  interfering  with  her

professional development activities, adding duties to her position,

isolating her, threatening her, and ultimately discharging her from

employment.  (Docket No. 203 at 23.)  Accordingly, the Court finds

that Lugo's allegations of engaging in protected conduct and having

suffered adverse employment actions are sufficient to make out a

plausible claim for relief under Title VII for retaliation for

participating in Gonzalez's sexual harassment investigation.  The

magistrate judge's report and recommendation is **ADOPTED** with

respect to this claim.

### b.  Law 115

Defendants  also  object  to  the  magistrate

judge's recommendation denying defendants' motion to dismiss Lugo's

Law 115 claim of retaliation.  Law 115 reads, in relevant part:

> (a) No employer may discharge, threaten, or discriminate
> against an employee regarding the terms, conditions,
> compensation, location, benefits or privileges of the
> employment should the employee offer or attempt to offer,
> verbally or in writing, any testimony, expression or
> information before a legislative, administrative or
> judicial forum in Puerto Rico, when such expressions are
> not of a defamatory character nor constitute disclosure
> of privileged information established by law.

29 L.P.R.A. § 194a.  In order to establish a *prima facie* case under Law 115, the employee must establish "through direct or circumstantial evidence" that "she (a) participated in an activity protected by §§ 194 *et seq.* and (b) was subsequently discharged." Lupu v. Wyndham El Conquistador Resort and Golden Door Spa, 524 F.3d 312, 313 (1st Cir. 2008) (internal quotations omitted).  The magistrate judge recommended that the Court deny defendants' motion to dismiss Lugo's Law 115 claims "for the same reasons discussed above with regard to Title VII."  (Docket No. 203 at 34.)  Law 115, however, imposes different requirements on the plaintiff to prove a *prima facie* case than does Title VII.  Lugo has not asserted any facts that demonstrate that she participated in an activity protected by Law 115.  In other words, Lugo did not "offer or attempt to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative, or judicial forum in Puerto Rico."  29 L.P.R.A. § 194a.  While "filing a charge with the EEOC" constitutes a protected activity, Cabrera v. Sears, Roebuck de Puerto Rico, Inc., No. 08-1325, 2009 WL 2461688, at *9 (D.P.R. Aug. 10, 2009), it is undisputed that Lugo filed her first EEOC complaint on January 29, 2009, after she was terminated on January 12, 2009.  (Docket No. 203 at 21-22.)  Lugo's complaints to her supervisors and to the Hospital's engineer and administrator (Docket No. 203 at 11-17) do not qualify as protected activities under Law 115.  Lupu, 524 F.3d at 313-314 (plaintiff's conversation

with supervisor at an internal meeting and written complaints left on supervisor's desk did not qualify as protected activities because he "never offered or attempted to offer any information to the Puerto Rico governmental authorities listed in the statute; nor had he threatened to go to such authorities".)  For the reasons stated, the Court finds that Lugo has failed to state a plausible claim for relief under Law 115.  Therefore, the magistrate judge's report and recommendation as to this claim is **REJECTED** and defendants' motion to dismiss this claim is **GRANTED.**

### 2.   Gonzalez's Claims

Defendants object to the magistrate judge's recommendation that this Court deny defendants' motion to dismiss on (1) Gonzalez's Title VII claims of hostile work environment; (2) Gonzalez's Title VII claims of *quid pro quo* sexual harassment; and (3) Title VII claims of retaliation.  (Docket No. 229 at 14-29.)  The Court addresses each of these claims in turn.

#### a.   Hostile Work Environment

Defendants allege that Gonzalez's claims of sex discrimination are time-barred and that they are not severe nor pervasive enough to prove a claim of a hostile work environment. Gonzalez filed an EEOC charge on August 8, 2008.  (Docket No. 203 at 25.)  This means that Gonzalez must assert at least one act of discrimination occurring after October 13, 2007 in order to satisfy the requirement of filing a discrimination charge within 300 days

of the alleged discrimination.  See 42 U.S.C. § 2000e-5(e)(1).

Gonzalez alleged that on March 4, 2008, she had a pituitary MRI

done at the hospital.  Gonzalez thought that a female MRI

technologist was conducting the MRI; unbeknownst to Gonzalez,

however, it was Torres who was administering the MRI and had

ordered Gonzalez, halfway through the MRI, to take off her shirt,

bra and girdle.  (Docket No. 203 at 6.)  While this incident, taken

alone, may not be sufficient to state a plausible claim of hostile

work environment, the Court must look to all the circumstances

surrounding the discriminatory conduct.  The Supreme Court has held

that "[t]he timely filing provision only requires that a Title VII

plaintiff file a charge within a certain number of days after the

unlawful practice happened.  It does not matter, for purposes of

the statute, that some of the component acts of the hostile work

environment fall outside the statutory time period.  Provided that

an act contributing to the claim occurs within the filing period,

the entire time period of the hostile environment may be considered

by a court for the purposes of determining liability." National

R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002).  While

defendants urge the Court not to consider the alleged

discriminatory acts that took place in November of 2006, the Court

finds that it may consider the incidents from November of 2006 as

part of Gonzalez's hostile environment claim because those

incidents may all be "part of one unlawful employment practice."
Id. at 118.

In order to state a *prima facie* case of hostile
work environment under Title VII, a plaintiff must prove the
following:  "(1) that she (or he) is a member of a protected class;
(2) that she was subjected to unwelcome sexual harassment; (3) that
the harassment was based upon sex; (4) that the harassment was
sufficiently severe or pervasive so as to alter the conditions of
plaintiff's employment and create an abusive work environment;
(5) that sexually objectionable conduct was both objectively and
subjectively offensive, such that a reasonable person would find it
hostile or abusive and the victim in fact did perceive it to be so;
and  (6)  that  some  basis  for  employer  liability  has  been
established."  O'Rourke v. City of Providence, 235 F.3d 713, 728
(1st Cir. 2001).  Gonzalez alleges that in late 2006, Torres asked
Gonzalez into his office, asked her to dance with him and locked
the door, gave her discomfiting looks, told her she "should be
scared" to be alone with him, asked her out and told her he wanted
to kiss her, and called her and asked what she would be wearing to
an employee softball game.  (Docket No. 203 at 2-3.)  Gonzalez
alleges that these incidents affected her ability to work:  she was
treated in the ER on many occasions, had anxiety attacks and was
depressed, and ultimately reported to the State Insurance Fund
(SIF) for several months.  (Docket No. 203 at 26.)  Finally,

employer liability is established because "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998). These allegations, in conjunction with the MRI incident of 2008, state a plausible claim for discrimination based on gender under Title VII to survive defendants' motion to dismiss. Therefore, the Court **ADOPTS** the magistrate judge's report and recommendation as to these claims.

### b.    *Quid Pro Quo* **Harassment**

Defendants also challenge the magistrate judge's recommendation denying defendants' motion to dismiss Gonzalez's *quid pro quo* sexual harassment claim against Torres. "To make out a *prima facie* case of *quid pro quo* harassment . . . the plaintiff must show that (1) he or she was subject to unwelcome sexual advances by a supervisor . . . and (2) that his or her reaction to these advances affected tangible aspects of his or her compensation, terms, conditions, or privileges of employment or educational training." Lipsett v. University of Puerto Rico, 864 F.2d 881, 898 (1st Cir. 1988). The first element is clearly met by the facts alleged by Gonzalez as described in the preceding section. As for the second element, "[a] tangible employment action constitutes a significant change in employment status, such

as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761. Defendants maintain that Gonzalez "did not claim that she was discharged, demoted or had no other choice but to resign because of her rejections to Torres' 'sexual advances' actions." (Docket No. 229 at 22.) The magistrate judge, however, found that Gonzalez suffered a tangible change in her employment conditions through "isolation, increased job duties, and unjustified disciplinary actions, culminating in her physical illness and sick leave while reported to the SIF." (Docket No. 203 at 28.) It is further plausible that Gonzalez's leave from work while she was being treated at the SIF caused her to be "denied an economic benefit" that was causally related to the sexual advances made by Torres and rejected by her. Acevedo Vargas v. Colon, 68 F.Supp.2d 80, 90 (D.P.R. 1999) (quoting Kotcher v. Rosa and Sullivan Appliance Ctr. Inc., 957 F.2d 59, 62 (2nd Cir. 1992)). The First Circuit Court of Appeals has held that "[i]f the plaintiff is threatened, and if the plaintiff is rewarded or punished, then there is *quid pro quo* harassment." Lipsett, 864 F.2d at 913-914 (finding that a reasonable jury could infer that plaintiff was pressured for sexual favors and retaliated against when after rejecting sexual advances from doctor, plaintiff described how doctor refused to meet with her and hear her side of the story before submitting complaints

about her to a supervisor.)  Thus, the Court finds that Gonzalez

has plausibly alleged a claim for *quid pro quo* harassment under

Title VII and the Court **ADOPTS** the magistrate judge's report and

recommendation as to this claim.

###    c.    Retaliation

Defendants allege that the magistrate judge

improperly denied defendants' motion to dismiss Gonzalez's claims

of retaliation.  In order for a plaintiff to make out a *prima facie*

case of retaliation under Title VII, she must prove that "(1) she

engaged in protected conduct under Title VII; (2) she suffered an

adverse employment action; and (3) the adverse action was causally

connected to the protected activity."   Fantini v. Salem State

College, 557 F.3d 22, 32 (1st Cir. 2009) (quoting Marrero v. Goya

of Puerto Rico, Inc., 304 F.3d 7, 22 (1st Cir. 2002)).  Defendants

do not contest that Gonzalez engaged in protected activity when she

filed a complaint to the EEOC in August of 2008.[2]  (Docket No. 203

at 29.)  Nor do they challenge the fact that the alleged adverse

employment actions lack factual or legal support.  The First

Circuit Court of Appeals has stated that "adverse employment

---

[2]  Unlike Lugo, Gonzalez's filing of an EEOC complaint in
August of 2008 also qualifies as a protected activity for the
purpose of stating a claim for relief under Puerto Rico Law 115.
See Cabrera v. Sears, Roebuck de Puerto Rico, Inc., No. 08-1325,
2009 WL 2461688, at *9 (D.P.R. Aug. 10, 2009) (finding that where
plaintiff filed a charge with the EEOC and was discharged by
defendant, plaintiff had established a *prima facie* case under Law
115).

actions include 'demotions, disadvantageous transfers or
assignments, refusals to promote, unwarranted negative job
evaluations, and toleration of harassment by other employees.'"
Marrero, 304 f.3d at 23 (quoting White v. New Hampshire Dept. of
Corrections, 221 F.3d 254, 262 (1st Cir. 2000)).

        Defendants' primary argument is that there is
"no temporal proximity between the alleged protected activity and
the alleged adverse [employment] action[s]" (Docket No. 229 at 26),
which include: receiving negative remarks and looks by
supervisors, being kept later than other employees on Christmas Eve
2008, issuing memos about medical certificates after she took
sickness or injury leave, blaming her for others' sub-par work,
throwing papers on her desk, and allowing her coworkers to yell at
her. (Docket No. 203 at 29.) In support of this claim, defendants
maintain that there was an eight month gap between April 8, 2008,
the last time Gonzalez submitted a complaint against Torres before
he was fired, and December 24, 2008, when Gonzalez experienced her
first alleged adverse employment action (being kept later than
other employees on Christmas Eve). Defendants fail to mention,
however, that Gonzalez was reporting to the SIF until August 14,
2008. (Docket No. 203 at 7.) Thus, the eight month gap, while
technically correct, does not take into account the fact that
Gonzalez was absent from her workplace for over four months in
between the time she engaged in protected activity and allegedly

faced adverse employment actions.  Defendants are correct that the four-month period between the time Gonzalez returned to work (August 14, 2008) and experienced her first alleged adverse employment action (December 24, 2008) may be "insufficient to establish a causal connection based on temporal proximity" alone. (Docket No. 229 at 27, citing <u>Calero-Cerezo v. U.S. Dept. of Justice</u>, 355 F.3d 6, 25-26 (1st Cir. 2004)).  The gap in time, however, is not so remote as to foreclose the possibility of a causal connection between the protected activity and the alleged adverse action.  <u>Compare</u> <u>Benoit</u>, 331 F.3d at 175 (finding that plaintiff failed to show a causal link between the protected activity and the adverse job action when more than one year had passed in between his complaints of discrimination and his termination from employment.)  At this stage of the proceedings, the Court finds that Gonzalez has plausibly alleged a claim of retaliation, and **ADOPTS** the magistrate judge's report and recommendation with respect to this claim.

   **3.  Puerto Rico Law Claims**

        Finally, defendants move this Court to dismiss plaintiffs' claims under Puerto Rico Laws 17, 69, 100 and 115. Defendants incorporate by reference their arguments regarding Title VII sexual harassment law to apply to local Laws 17, 69 and 100, because "the substantive law of Puerto Rico on sexual harassment . . . appears to be aligned . . . with Title VII law . . . ."

(Docket No. 229 at 28.)  Given the fact that the Court has adopted the magistrate judge's report and recommendation with respect plaintiff Gonzalez's Title VII sexual harassment claims, defendants' motion to dismiss Gonzalez's claims under Laws 17, 69 and 100 is **DENIED** and the magistrate judge's recommendation is **ADOPTED** with regard to those claims.  The Court further **ADOPTS** the magistrate judge's recommendation to **DISMISS** Lugo's claims under Laws 17, 69 and 100 because her Title VII harassment claims were time-barred.

          As to Law 115, the Court has already addressed plaintiff Lugo's claims under Law 115.  Defendants maintain that "Law 115 requires the same adverse employment action showing as a Title VII retaliation claim . . . ." (Docket No. 229 at 28.)  The Court has adopted the magistrate judge's report and recommendation with respect to Gonzalez's claims for Title VII retaliation, and finds that Gonzalez has similarly established a plausible claim for relief under Law 115.[3]  Thus, the Court **ADOPTS** the magistrate judge's recommendation to **DENY** dismissal of Gonzalez's claims under Law 115.

_____

          [3] Unlike plaintiff Lugo, who failed to assert a claim under Law 115, plaintiff Gonzalez has established that she engaged in a protected activity under Law 115 because she filed a complaint with the EEOC prior to her termination.

### III. Conclusion

The Court has made an independent examination of the entire record in this case and **ADOPTS IN PART AND REJECTS IN PART** the magistrate judge's findings and recommendations. Specifically, the magistrate judge's findings are **REJECTED** with regard plaintiff Lugo's Law 115 claims. Contrary to the report and recommendation, the Court **DISMISSES WITH PREJUDICE** Lugo's claims under Law 115.

Accordingly, defendant's motion to dismiss, (Docket No. 64), is **GRANTED IN PART AND DENIED IN PART**. The Court **DISMISSES WITH PREJUDICE** (1) both plaintiffs' claims against all defendants under the First Amendment and the FMLA; (2) both plaintiffs' Title VII claims against the individual defendants and their spouses and conjugal partnerships (where applicable); (3) both plaintiffs' Article 1802 and 1803 claims; (4) all of Lugo's claims under Title VII and Laws 17, 69, 100 and 115 for discrimination and for retaliation based on reporting her alleged harassment (*i.e.* all claims arising out of her second EEOC charge); (5) all of Lugo's claims under Law 115 for retaliation based on participation-based retaliation; (6) Gonzalez's claims under Laws 17, 69 and 100 against the individual defendants, their spouses and conjugal partnerships (where applicable) except against Torres; and (7) Gonzalez's claims under Law 115 against the individual defendants, their spouses and conjugal partnerships (where applicable) except against Torres and Cruz. The Court **DISMISSES**

**WITHOUT PREJUDICE** (1) Gonzalez's claims under Laws 17, 69 and 100 against Torres's conjugal partnership with his spouse; and (2) Gonzalez's claims under Law 115 against Torres's and Cruz's spouses and conjugal partnerships.   The Court **DENIES** defendants' motion to dismiss (1) Lugo's Title VII claims for participation-based retaliation against the Hospital and its insurers; (2) Gonzalez's Title VII claims against the Hospital and its insurers; (3) Gonzalez's claims against Torres, the Hospital, and its insurers under Laws 17, 69 and 100; and (4) Gonzalez's Law 115 claims against Torres and Cruz.   Those claims remain.

> **IT IS SO ORDERED.**

San Juan, Puerto Rico, September 28, 2011.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE
