IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ROSA ANGELA GONZÁLEZ-SANTOS,
*et al.*,

      Plaintiffs,

      v.

                                    **Civil No. 09-1850 (FAB/BJM)**

ANGEL G. TORRES-MALDONADO,
*et al.*,

      Defendants.

## REPORT AND RECOMMENDATION

     Rosa Angela González-Santos ("González") and Brenda Lugo-Caraballo ("Lugo") (collectively, "plaintiffs") sued Instituto Médico del Norte, Inc., d/b/a Hospital Wilma N. Vázquez ("the Hospital"), Luis Cruz-Martínez ("Cruz") and his conjugal partnership, José Pabón-Quiñones ("Pabón") and his conjugal partnership, Aymette García ("García") and her conjugal partnership, Eduarda Pabón, Enrique Vázquez, and Liberty Mutual Insurance Corp. ("Liberty") (collectively, "the Hospital defendants"), as well as Chartis Insurance Company ("Chartis") and Angel Torres-Maldonado ("Torres") and his conjugal partnership.  Plaintiffs allege that the various defendants violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*, Law No. 100 of June 30, 1959 ("Law 100"), 29 L.P.R.A. §§ 146 *et seq*, Law No. 69 of July 6, 1985 ("Law 69"), 29 L.P.R.A. §§ 1321 *et seq.*, Law No. 17 of April 22, 1988 ("Law 17"), 29 L.P.R.A. §§ 155 *et seq.*, and Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 L.P.RA. §§ 5141 and 5142.  (Docket No. 108).  The court dismissed several of plaintiffs' claims under Fed. R. Civ. P. 12(b)(6).  (Docket No. 244).  Before the court are motions for summary judgment by plaintiffs (Docket No. 97), the Hospital defendants (Docket No. 154), and Chartis (Docket No. 202).  Each motion has been opposed.  (Docket Nos. 118, 156, 196, and 214).  The motions were referred to me for a report and recommendation. (Docket Nos. 39, 188, and 247).  For the reasons that follow, I recommend that Chartis's motion for

summary judgment be **granted**, plaintiffs' motion for summary judgment be **denied**, and the

Hospital defendants' motion be **granted in part**.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of the case are summarized here after applying Local Rule 56, which structures the

presentation of proof at summary judgment.[1]

### *The Parties and their Employment with the Hospital*

On August 12, 2002, González began work as an Office Clerk in the Imaging Center at the

Hospital. (Docket No. 97-1, ¶ 3; Docket No. 154-1, ¶ 2.). On August 13, 2002, González signed

---

[1] The rule "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Market Inv. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008), and prevents parties from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 219 (1st Cir. 2007). The penalty for noncompliance is severe: "If the party opposing summary judgment fails to comply with Local Rule 56(c), the rule permits the district court to treat the moving party's statement of facts as uncontested." Id. Thus, litigants ignore the rule "at their peril." Id.

A motion for summary judgment must be supported by "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." Local Rule 56(b). The party opposing a motion for summary judgment must admit, deny, or qualify the moving party's facts by reference to each numbered paragraph, and may make a separately numbered statement of material facts. Local Rule 56(c). Finally, the movant replying to the opposition may admit, deny, or qualify only the non-movant's newly-stated facts, again in a separate statement and by reference to each numbered paragraph, Local Rule 56(d). Any facts supported by citation to record evidence and not properly controverted as described by the rule are deemed admitted. Local Rule 56(e).

The Hospital defendants' opposition to plaintiffs' statement of facts (Docket No. 118-1) fails to meet Local Rule 56(c)'s requirements in three ways. First, the opposition includes extended narratives that go beyond the pale of "short" or "concise." For instance, "paragraph 18" spans three and a half pages, including two paragraph breaks. Many of these narratives are duplicated in response to various facts, with no effort to highlight what factual premise is being contested. Because these extended responses require the court to sort out the evidence at issue, defeating the purpose of the rule, I have disregarded them. Second, a Local Rule 56(c) statement may only offer additional *facts*. Therefore, I have disregarded the portions of the Hospital defendants' opposing statement that submit legal argument. (See, e.g., Docket No. 118-1, ¶ 23) ("Co-defendants affirmatively aver that any reference made by Plaintiffs as to hostile work environment should not be addressed under Title VII . . . ."). Finally, the local rule requires additional facts to be stated in numbered paragraphs in a separate section. Instead, the Hospital defendants litter facts throughout their opposition without listing them in a separate statement. (See, e.g., id., ¶ 33) ("Notwithstanding, it is affirmatively averred that what the named witnesses allegedly saw . . . were [sic] never informed to [sic] the Hopsital . . . .").

The response embedded in plaintiffs' reply motion (Docket No. 133, ¶¶ 5–34) also violates the rule by not being separately stated, and has been disregarded for the purposes of deeming facts admitted. See Local Rule 56(d). Furthermore, it includes several exhibits; to the extent these exhibits are not referenced in the Local Rule 56 statements of fact, I have not taken them into account.

The Hospital defendants' reply statement of facts in support of their own motion (Docket No. 205-2) does not comply with Local Rule 56(d) because it is not "limited to any additional facts submitted" by the plaintiffs. It is therefore disregarded here.

a document acknowledging receipt of the Hospital's sexual harassment policy.  (Docket No. 97-1, ¶ 1).  The policy establishes a procedure for filing, investigating, and resolving sexual harassment complaints.  (Id., ¶ 2). Lugo was hired in August 2006 as a Nuclear Medicine Technologist.  (Docket No. 154-1, ¶¶ 63, 79).  On August 21, 2006, Lugo signed a document acknowledging receipt of the Hospital's sexual harassment policy.  (Docket No. 97-1, ¶ 1).

On October 1, 2004, González sent two letters to the Director of Human Resources complaining that Cruz was hostile towards her.  (Docket No. 154-1, ¶ 87).  González co-authored a letter discussing an increase in tasks in the X-Ray Department Reception Area and requesting a raise.  (Id., ¶ 88).  González and a coworker, Emily Bonilla ("Bonilla"), shared a workstation; another employee, Joshiana Ginés ("Ginés"), was separated from them by a door.  (Id., ¶ 33).  In October 2006, Torres began working as Director of the Imaging Center.  (Docket No. 97-1, ¶ 4).

*Miscellaneous Complaints Regarding Torres*

González's coworker Ginés stated that Torres would leer at passing females and then give them compliments, and "often used foul language."  (Docket No. 97-43).  Lugo wrote that Torres and Cruz "spoke vulgarly," referring to unnamed employees as "that fucker, that queer, that asshole," and saying that Torres nicknamed García "little hairy ass."  (Docket No. 97-41).  Lugo also testified in her deposition that Torres mistreated all employees, both male and female, and referred to them using vulgar words.  (Docket No. 154-1, ¶¶ 71–72). González's coworker Bonilla and another woman, Jenny Ayala Pinto, described unwanted advances from Torres.  (Docket No. 97-1, ¶ 32).  Edgar Martínez Aponte ("Martínez") and Bonilla said Torres spoke loudly and yelled at employees.  (Id., ¶ 33).  Employees who had to use the restroom had to seek Torres's permission or notify him.  (Id., ¶ 34).  Lugo, Ginés, and Bonilla saw González crying at some point.  (Id., ¶ 35).  Torres told Lugo and Bonilla he would find a way to get González fired.  (Id., ¶ 36).  Torres had a relationship with Bonilla.  (Id., ¶ 37).  Ginés, Martínez, Bonilla, and Ayala said Torres overworked them and other employees.  (Id., ¶ 38).  In their depositions, both Martinez and Bonilla testified they had an excess of work at the hospital.  (Docket No. 154-1, ¶ 89).

### *Torres's Conduct in Late 2006 and González's First Complaint*

On November 16, 2006, Torres asked González to dance with him.  (Docket No. 154-1, ¶ 6).
On November 17, Torres asked if she was happily married, and told her they could escape together
if not.  (Id.).  On November 18, he asked if she would wear short jeans to a baseball game, and told
her he wanted to give her a kiss.  (Id.).  At two opportunities for private conversation on November
17 and 18, González did not mention Torres's conduct to other Hospital employees who were there.
(Id., ¶¶ 7–8).  On November 22, 2006, González told Cruz about Torres's approaches, and mentioned
that she had written down the incidents.  (Id., ¶ 9; Docket No. 97-1, ¶ 11).  Cruz did not immediately
report the information to García, who was the Human Resources Manager.  (Docket No. 97-1, ¶ 12).
On November 30, 2006, García met with Cruz after another employee, María Vazquez, commented
to her that there were rumors about a situation regarding Torres and a female employee.  (Id., ¶ 13).
Following her meeting with Cruz, García met with Torres.  (Id., ¶ 14).  García called González to
meet with her regarding the information Cruz had forwarded regarding her complaint.  (Id., ¶ 15).
On November 30, 2006, González filed a "Report of Inappropriate Harassment" on a form provided
by the hospital complaining about Torres.  (Id., ¶ 6; Docket No. 154-1, ¶ 12).  González gave García
a handwritten report, which García had requested on December 1, 2006.  (Docket No. 97-1, ¶ 16;
Docket No. 154-1, ¶ 12).  A handwritten document González created, with the date November 16,
2006 written on it, related the following three narratives:

> Mr. Torres calls me to work, I go to his office.  I notified Ms. Marinel Glz that I was
> going to be at Mr. Torres's office in case she needed me.  Mr. Cruz call[ed] to verify
> why I was there and Mr. Torres indicated to him that he need[ed] me for various days
> to perform the work.  Mr. Torres indicate[d] to me that he was the director and that
> he was the one that had to know that I was there or where I was going to be[.] [T]hat
> answer[] bewildered me[.]  [T]here he began putting music on the computer, closed
> and locked the door and ask[ed] me if I kn[ew] how to dance.  I indicated yes[.]  He
> tells me ["]let's dance this piece.["]  I told him "you are crazy."  He told me "a woman
> has never refused to dance a piece with me."  I indicated that I did not dance with
> unknown persons.  He tells me that "I already have a month working here and you
> know me."  I indicated that I had gone to perform a job.  He continued to insist . . .
> a merengue, a salsa, or a bolero.  He would tell me "Let's do it. Nobody is going to
> find out."  Every time that I went to his office, he would close the doors[.]  [A]t one
> moment I indicated to him that I felt uncomfortable[;] I asked him if he could open
> the door because I could not work that way.

**Rosa Angela González-Santos,** *et al.* **v. Angel G. Torres-Maldonado,** *et al.*                    Page 5
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

(Docket No. 97-16, p. 1).

> There he begins to tell me "Do you go out by yourself? Don't you take small escapades?" I told him "I am a married person." He tells me "But are you happily married?" He tells me this three times and tells me " I am a divorced person with two daughters but you find the place and we can escape. Nobody has to find out why because when things are done correctly nobody will find out . . .".

(Id., p. 1–2).

> I went to his office and I indicated to him and he rapidly asked me asked if I was not afraid to go by myself to his office. I indicated that yes and asked him why. He indicated that "since I am by myself, are you scared?" There I indicated I am leaving because I am in a rush with that of the game and I am doing the last of what I need. He tells me "Rosangela, remember that we have something pending," and he tells me "Come here." I was at the glass door of Nuclear medicine and he was near the wooded area and he indicated "come here, that I have to tell you something." I indicated "Tell me, from there, since I am rushed." He tells me "and you go in real short jeans to the game. Because if you go that way, I will go." An[d] he tells me "But come here, I want to give you a kiss." When he indicates this, I left the area running and I left crying . . . .

(Id., p. 2). In her complaint form, González stated that her response to Mr. Torres's harassment was to tell him that she "had gone to the office to perform a (unintelligible) that he please respect me, and that he had to (unintelligible) because I am a married person." (Docket No. 97-1, ¶ 10).

González complied with the Hospital's complaint procedure. (Id., ¶ 9). On December 1, 2006, the Hospital received letters from Torres and Cruz stating their positions with respect to González's allegations. (Docket No. 154-1, ¶¶ 18–19). García and González met again on December 4, 2006. (Docket No. 97-1, ¶ 17). According to García's meeting notes, González said Torres related to her in a professional manner as far as work was concerned. (Docket No. 154-1, ¶ 22). García also met with Torres and Cruz again on December 4. (Id., ¶ 21). The Hospital concluded there had been no improper behavior, and took no disciplinary measures against Torres. (Id., ¶ 24). However, the Hospital advised Torres of the consequences of violating its harassment policy in the future. (Id., ¶ 25). González had to continue working in the same area as Torres, and she felt that Human Resources was unresponsive to her sexual harassment complaint. (Docket No. 97-1, ¶ 18).

Sometime in December, González accompanied two coworkers who bought gifts for a gift

exchange at a Condom World store.  (Docket No. 154-1, ¶ 31).  García became aware at some point that Torres had organized a gift exchange involving gifts with sexual connotations.  (Docket No. 98-4, ¶¶ 41–42).

### *Disciplinary Memos and Other Conduct Between December 2006 and April 2008*

On December 1, 2006, Torres sent a communication to all personnel regarding working hours and break periods.  (Docket No. 154-1, ¶ 29).  Torres addressed a letter to plaintiff González and Marinel González regarding a Hospital patient's report that he had been treated inappropriately by the receptionist.  (Id., ¶ 30).  On December 21, 2006, Cruz sent a letter to Torres and García regarding an incident where he alleged she was disrespectful towards him.  (Id., ¶ 32).  Torres held a meeting with all personnel on December 21.  (Id., ¶ 35).  González took vacation leave between December 6, 2006 and January 19, 2007.  (Id., ¶ 35).  González made no written complaints to the Hospital between the end of 2006 and April 2008.  (Id., ¶¶ 27–28).  On June 26, 2007, Lugo received a written warning of insubordination; she refused to sign the memo, and delivered two written responses to Pabón that day.  (Id., ¶¶ 64–65).  Torres gave González a memo on January 22, 2007 because she reported her return to work to a person other than her supervisor.  (Id., ¶ 36).  On February 6, 2008, Torres met with González, Nilsa García, and Cruz to discuss issues regarding the reception area.  (Id., ¶ 37).  Torres sent a memo on February 12, 2008 to clerical staff regarding doctors' and patients' complaints.  (Id., ¶ 38).  On March 14, 2008, Torres gave González a memo regarding performance issues and violation of a disciplinary rule; however, no disciplinary measures were taken against her.  (Id., ¶ 39).  González registered at the emergency ward of the Hospital that day, complaining of anxiety.  (Docket No. 97-1, ¶ 20).[2]  In her deposition, González said she had been diagnosed with anxiety or panic attacks, and she was permitted to withdraw from work for between one and two weeks.  (Id., ¶ 19).  González completed State Insurance Fund papers at the Hospital's human resources department.  (Docket No. 154-1, ¶ 40).

---

[2] González states that she filed a State Insurance Fund claim in which she referred to "a situation" with Torres. (Docket No. 97-1, ¶ 21).  However, she does not cite to an English translation of this evidence, and none is apparent on the docket.  I have therefore disregarded this statement as unsupported by admissible evidence.

**Rosa Angela González-Santos,** *et al.* **v. Angel G. Torres-Maldonado,** *et al.*                    Page 7
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

### *April 2008 Complaints Against Torres and Torres's Termination*

On April 2, 2008, Lugo wrote a letter complaining to Pabón that Torres had made false accusations against her. (Docket No. 154-1, ¶ 66). Lugo and García met on April 10, 2008, and García asked Lugo to make a written statement of her complaints against Torres and Cruz. (Id., ¶ 67). Lugo submitted her statement on April 11, 2008. (Id., ¶ 68). According to García, the statement recounted "various instances where Mr. Torres allegedly incurred in improper conduct." (Id., ¶ 77). This was the only Hospital investigation that Lugo participated in. (Id., ¶ 70). She submitted no other written communication regarding Torres or Cruz. (Id., ¶ 76).

Meanwhile, on April 8, 2008, González wrote to the hospital's human resources department, inquiring about the November 2006 sexual harassment complaint and complaining about Torres's conduct towards her. (Docket No. 97-1, ¶ 22; Docket No. 154-1, ¶ 41). The Hospital investigated this complaint. (Docket No. 154-1, ¶ 42). According to the letter, González underwent a pituitary MRI at the Hospital on March 4, 2008. A technician directed González to remove all metal, but told her she could leave her blouse on because the study was of her head. During the study, the technician returned and said that, on Torres's orders, González had to remove her blouse and undergarments. Torres told González that he personally performed the MRI to ensure she was fit to return to work. (Docket No. 97-29, p. 2). González testified in her deposition that she did not leave the study after discovering Torres was running it, and did not know whether he had seen her while undressed. (Docket No. 154-1, ¶ 46). The letter also complained about the February 12, 2008 memo, and of being "held responsible" for work she allegedly did not perform correctly on February 19, 2008 while she was checked in as a patient in the emergency ward. (Id., ¶ 41).

On April 18, 2008, a meeting was held between Torres, García, and Suhail Montalvo, the Secretary of Human Resources, discussing Torres's discharge from employment. (Docket No. 97-1, ¶ 24). According to the meeting minutes, García said:

> I remind you also that when you began working for this institution, even before you completed your probationary period, there was an accusation against you for sexual harassment on the part of Rosangela González, clerk of the department that you manage, this situation was discussed with you; and since the Administration gave you

another opportunity and gave you the benefit of the doubt[,] for which reason no disciplinary action was taken against you at that moment[,] you know that this employee is under sick leave through the State Insurance Fund and that her allegations are that there is a hostile environment in your work area.

(Id.). Torres was terminated on April 18, 2008 for violating the Hospital's rules and regulations. (Id., ¶ 25). In her deposition, García said he was terminated because of complaints about his supervision techniques, as well as "some improper conduct." (Docket No. 154-1, ¶ 49). However, she testified that the Hospital's investigation did not find evidence of sexual harassment. (Id.).

### *Torres's Suit Against the Hospital*

In a complaint filed in the Bayamón Court of First Instance in August 2009, Torres alleged that González made an unfounded accusation of sexual harassment against him, but that the Hospital found no proof and took no action against him. (Docket No. 97-1, ¶ 27). The Hospital denied this in its answer (Id., ¶ 29) and pleaded that Torres "incurred in [sic] acts that constitute sexual harassment against the Hospital's policy" and was fired "since he violated rules and regulations of the Hospital by engaging in improper conduct related to his work" (Id., ¶ 30).

### *Administrative Charges, Other Meetings, and Termination of Lugo and González*

González filed an EEOC sex discrimination charge on August 6, 2008. (Docket No. 154-1, ¶ 52). The EEOC did not conclude any statutes were violated. (Id.). González returned to work from State Insurance Fund leave on August 14, 2008. (Id., ¶ 51). Neither party has highlighted evidence of when she left, however. Paragraph 48 of the Hospital's disciplinary table indicates that supervisors' sexual harassment of employees is prohibited, and discharge may follow the first occasion. (Docket No. 98-4, ¶ 39). A letter from the EEOC to González states that the Hospital said it investigated the 2006 incidents and found no evidence. (Id., ¶ 40).

The Nuclear Medicine Department was closed, and Lugo and the other employee of that department were both terminated on January 9, 2009. (Docket No. 154-1, ¶ 80). Lugo's salary was never reduced, nor was she demoted to a lower-paying position. (Id., ¶ 78). The Hospital closed the Department for economic reasons. (Id., ¶ 81).

On January 16, 2009, González wrote Pabón a letter informing him of a meeting she had with

**Rosa Angela González-Santos,** *et al.* **v. Angel G. Torres-Maldonado,** *et al.*                    Page 9
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

García and Cruz regarding why she had not been released from work at 3:00 p.m. on December 24, 2008 like other employees. (Docket No. 154-1, ¶ 54). García replied with a written request for González to explain how she had been discriminated against. (Id.). González's reply letter on January 23, 2009 said she felt retaliated against for complaining about Torres in 2006. (Id., ¶ 55). García replied that the decision not to let her leave early on December 24, 2008 was administrative. (Id.).

Lugo filed an EEOC charge of retaliation on January 29, 2009, citing incidents that included a comment Torres allegedly made in March 2008 accusing her of working under a false medical certificate. (Id., ¶¶ 82–83). In August 2009, Lugo was informed that the Nuclear Medicine Department would reopen in September, and she was offered a job as a Nuclear Medicine Technician. (Id., ¶ 84). The EEOC dismissed Lugo's retaliation complaint on January 21, 2010. (Id., ¶ 85). Lugo filed a new EEOC complaint on March 29, 2010, alleging that retaliation and sex discrimination occurred on January 12, 2009; the complaint was dismissed as untimely. (Id., ¶ 86).

On November 6, 2009, a memo to all hospital employees regarding medical certificates was issued. (Docket No. 154-1, ¶ 56). González had been permitted to have Fridays off in early 2010. (Id., ¶ 57). González and a Mrs. Martínez had a discussion regarding her compliance with the hospital uniform policy while she was pregnant, but no disciplinary action resulted. Id., ¶ 58.

On October 13, 2010, González attended a deposition, where she turned over documents that included patient records. (Id., ¶ 59). At the deposition, she stated that she used her computer password to access the patient records, knowing the information was confidential. (Id., ¶ 60). She retrieved patient information about Torres and Cruz, and provided the information to a private investigator without their consent. (Id., ¶ 61). The Hospital terminated González on November 20, 2010 for violating the hospital's employment and confidentiality policies. (Id., ¶ 62).

### *The Chartis Insurance Coverage*

Chartis issued a "Directors, Officers and Private Company Liability Insurance Policy, including Employment Practices and Securities Liability" to the Hospital, covering the period August

31, 2006 through August 31, 2007.  (Docket No. 202-1, ¶ 13).  The policy was "a Claims-made Policy."  (Id., ¶ 14).  The policy contains a notice and claim reporting provision.  (Id., ¶ 20).

González submitted a written report of harassment and a detailed account of her allegations to the Hospital on December 1, 2006.  (Id., ¶¶ 5–6).  González's original complaint was filed on August 26, 2009.  (Docket No. 1).  Lugo joined the case on April 22, 2010.  (Docket No. 23).  Chartis was named as a defendant in the fifth amended complaint, filed March 31, 2011.  (Docket No. 108).  Chartis was served with process on April 1, 2011.  (Docket No. 202-1, ¶ 3).  The Hospital never notified Chartis of González and Lugo's internal complaints, EEOC charges, or civil complaints; Chartis became aware of the litigation for the first time on April 1, 2011.  (Id., ¶¶ 21–23).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material only if it "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  The court does not weigh the facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact."  Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1).  Once this threshold is met, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  However, the court draws

inferences and evaluates facts "in the light most favorable to the nonmoving party," Leary, 58 F.3d
at 751, and an evaluating court may not "superimpose [its] own ideas of probability and likelihood
(no matter how reasonable those ideas may be) upon the facts of the record." Greenburg v. P.R.
Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

Nonetheless, summary judgment is appropriate where the nonmoving party rests entirely
upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential
element of the claim. Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## DISCUSSION

Plaintiffs' and the Hospital defendants' motions were filed while a motion to dismiss under
Rule 12(b)(6) was still pending decision by the court. The court granted the motion in part, leaving
only the following claims: (1) Lugo's Title VII retaliation claim arising out of her assistance with
González's complaint; (2) González's Title VII claims of hostile work environment, quid pro quo
harassment, and retaliation against the Hospital and its insurers; (3) González's claims under Laws
17, 69, and 100 against the Hospital, its insurers, and Torres; and (4) González's Law 115 claim
against Torres and Cruz. (Docket No. 244, p. 47–48). I therefore do not reach the parties'
discussion of the claims that the court has already dismissed.

## I.       Chartis's Motion for Summary Judgment

Chartis moves for summary judgment on all claims because it did not receive notice of
plaintiffs' claims during the appropriate period of its "claims-made" insurance policy. (Docket No.
202). A claims-made policy is one which covers all claims made during a specified period of
coverage, so long as they are timely reported to the insurer pursuant to the policy's terms. Torres
v. E.L.A., 130 D.P.R. 640, 645 (1992) (partially translated in Orbi, S.A. v. Calvesbert & Brown, 20
F.Supp.2d 289, 292 (D.P.R. 1998)). Thus, when an insured does not report a claim during the proper
period, the insurer is not obligated to cover that claim. Id. at 652. This type of insurance does not
violate Puerto Rico's public policy. Id.

Plaintiffs argue that Puerto Rico law and public policy require Chartis to show some

prejudice in order to avoid liability for breach of a cooperation clause.  (Docket No. 214).  But as

Chartis correctly argues, the rule plaintiffs rely on does not reach the notice requirement of a claims-

made policy.  A "cooperation clause" imposes a duty on the insured to cooperate with the insurance

company's investigation of the claim, allowing it "to determine whether there is a genuine defense

with respect to the claim made," and to decide whether the claim should be settled.  See Cuebas v.

P.R. Am. Ins. Co., 85 P.R.R. 601, 612–13 (1962).  Such clauses also help uncover "possible

collusion between the insured and the prejudiced party to defraud the company."  Valle v. Heirs of

Wiscovitch, 88 P.R.R. 84, 87 (1963).  But because the clauses limit coverage, an insurer must show

that it has suffered some "material and substantial" prejudice—in other words, that some rationale

for denying coverage exists—in order to avoid liability.  See Cuebas, 85 P.R.R. at 612–13; see also

Municip. of San Juan v. Great Am. Ins. Co., 812 F.2d 520, 521 (1st Cir. 1987) (prejudice showing

also preserves duty to defend).

In contrast, the notice requirement of a claims-made policy "is an integral part of the risk

foreseen and assumed by the insurance company."  Orbi, 20 F.Supp.2d at 292 (translating Torres,

130 D.P.R. at 652).  The First Circuit succinctly described the analytic distinction when construing

a similar rule under Massachusetts law:

> The purpose of the notice requirement in "claims made" policies is to ensure fairness
> in rate-setting; whereas its purpose in an "occurrence" policy is to permit an insurer
> to make an investigation of the facts relating to liability. A late notice would clearly
> always inhibit the insurer's task of setting its future premiums and reserves with full
> knowledge of the outstanding claims it is obligated to meet, while it would not
> necessarily have the same effect with regard to the investigation of the facts
> pertaining to the insured event. Hence, a showing of prejudice is justly required in
> the latter while not in the former.

Nat'l Union Fire Ins. Co. v. Talcott, 931 F.2d 166, 168 n. 4 (1st Cir. 1991) (internal punctuation and

citations omitted); see also Pagan-Torres v. Puerto Rico Land Auth., No. 02-1050, 2005 WL 190754,

at *7 (D.P.R. Aug. 10, 2005) (reaching same conclusion under Puerto Rico law).

Here, there is no dispute that the Hospital's policy with Chartis is "claims-made."  Therefore,

its requirement of notice within the coverage period is enforceable under Puerto Rico law, and

Chartis is not subject to any heightened burden of showing substantial prejudice from a lack of

notice.  Turning to the terms of the policy, it defines a "claim" as:

> (1) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); or

> (2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or nonmonetary relief which is commenced by:
> (i) service of a complaint or similar pleading; or
> (ii) return of an indictment (in the case of a criminal proceeding); or
> (iii) receipt or filing of a notice of charges.

> (3) an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission (EEOC) (or similar state, local or foreign agency) which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the Insured. However, in no event shall the term "Claim" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

> The term "Claim" shall include an Employment Practices Claim and a Securities Claim.

(Docket No. 202-3, p. 4–5).  The notice clause provides:

> (a) The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

> > (1) Anytime during the Policy Perdio [*sic*] or during the Discovery Period (if applicable); or

> > (2) Within **SIXTY (60) DAYS** after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than **SIXTY (60) DAYS** after the date such Claim was first made against an Insured.

(Docket No. 202-3, pp. 12, 33) (emphasis in original).  It is undisputed that Chartis first received notice of González and Lugo's internal complaints, EEOC charges, and civil complaints on April 1, 2011, more than sixty days after the end of the policy's claims period.  (Docket No. 202-1, ¶¶ 22–23).  Chartis is therefore entitled to dismissal of all claims against it.

## II.   Plaintiffs' Motion for Partial Summary Judgment

González moves for partial summary judgment on her discrimination claims under Title VII and Puerto Rico law, arguing (1) that the Hospital is estopped from denying that Torres's conduct constituted sexual harassment,(2) that she is entitled to judgment on her hostile work environment

**Rosa Angela González-Santos,** *et al.* **v. Angel G. Torres-Maldonado,** *et al.*                Page 14
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

claim, and (3) that she is entitled to judgment for a claim that the Hospital breached its Law 17

duties.  (Docket No. 97).  I consider each of these issues in turn.

> **A.        Judicial Estoppel**

Read generously, plaintiffs' motion argues that the Hospital should be judicially estopped

from arguing that Torres's conduct did not constitute actionable sexual harassment.  (Docket No.

196, ¶¶ 30–42).  Judicial estoppel "prevents a litigant from pressing a claim that is inconsistent with

a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same

legal proceeding." InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003).  Two conditions must

exist for the doctrine to apply: (1) the earlier and later positions must be "directly inconsistent, that

is, mutually exclusive," and (2) a court must have been persuaded to accept the earlier position.  Alt.

Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004).  The doctrine is not

mechanically applied, however; the policy concern at stake is the integrity of the judicial process,

threatened by "the appearance that either the first court has been misled or the second court will be

misled . . . ." Id.

Plaintiffs vaguely ask the court to "hold defendants as *estopped* from asserting positions,

defenses[,] and averments in this case that are contrary to the positions they assumed in the Bayamon

Superior Court case prior to the filing of this case with regards to the acts of sexual harassment

incurred by co-defendant Angel Torres while employed as a supervisor and department director at

the Hospital." (Docket No. 196, ¶ 42) (emphasis in original).  Beyond the portions of the Hospital's

pleadings that plaintiffs offered translations of, however, it is not clear what contrary positions they

deign to challenge.  I remind the plaintiffs that "[j]udges are not mind-readers, so parties must spell

out their issues clearly, highlighting the relevant facts and analyzing on-point authority." Velasquez

Rodriguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).  Therefore, I have only

analyzed the evidence submitted and highlighted in plaintiffs' pleadings as summary judgment facts.

In Torres's Commonwealth suit, the Hospital pleaded that (1) it received a complaint of

sexual harassment against Torres in November 2006, (2) Torres engaged in conduct constituting

"sexual harassment against the Hospital's policy," and (3) Torres was fired "since he violated rules and regulations of the Hospital by engaging in improper conduct related to his work." (Docket Nos. 97-34, 97-35). These pleadings do not bar the Hospital from arguing here against a finding of actionable sexual harassment, however. First, there is no logical inconsistency in arguing that Torres's conduct both (1) violated an internal policy on sexual harassment and was the reason for his discharge, but (2) nonetheless is not actionable by González under federal and Commonwealth law. Though the plaintiffs may find this nuance to be frustrating, the Hospital does not appear to be misleading either court. Moreover, plaintiffs do not highlight any rulings of the Commonwealth court showing that it was persuaded to accept the Hospital's position. Absent some evidence that the Hospital prevailed on a directly inconsistent claim that it advanced in Commonwealth court, judicial estoppel is not implicated.

### B.    Hostile Work Environment under Title VII and Puerto Rico Law

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000-e-2(a)(1). Sexual harassment which is sufficiently severe or pervasive as to alter the conditions of the victim's employment creates an abusive working environment and violates Title VII. Pa. State Police v. Suders, 542 U.S. 129, 133 (2004); Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). An employer's liability for a hostile work environment claim depends on the harasser's employment status relative to the plaintiff's: the employer may be found vicariously liable if the plaintiff's supervisor created a hostile work environment, but where the harasser is a coworker, the employer is liable only if it was negligent either in discovering or remedying the harassment, meaning it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 230-31 (1st Cir. 2007) (citations and quotations omitted); Torres-Negron, 488 F.3d at 40 (citing Faragher, 524

**Rosa Angela González-Santos,** *et al.* **v. Angel G. Torres-Maldonado,** *et al.*                    Page 16
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998)); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002)).

A hostile work environment claim consists of six elements: (1) the plaintiff is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on membership in the protected class; (4) the harassment was severe and pervasive enough to alter the conditions of employment and create a hostile work environment; (5) the conduct was both objectively and subjectively offensive; and (6) some basis for employer liability has been established. Agusty-Reyes v. Dep't of Educ. of P.R., 601 F.3d 45, 53 n.6 (1st Cir. 2010) (citations omitted). Federal anti-discrimination law does not create "a general civility code" for the workplace. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  Therefore, it is not enough for a jury to find that the plaintiff was harassed; the harassment itself must also be discriminatory.  Id. Nonetheless, hostile conduct that is gender-motivated, though not sexual, can be weighed as part of the hostile environment calculus.  O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).   The hostile work environment analysis "requires an assessment of the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (quoting Harris, 510 U.S. at 23).   Title VII only prohibits discriminatory harassment that is severe; thus, "[r]udeness or ostracism, standing alone, is not enough to support a hostile work environment claim." Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).

The elements of a hostile environment claim under Puerto Rico law are analogous to those under Federal law.  Under Law 17, hostile-environment harassment occurs where "any type of undesired sexual approach, demand for sexual favors and any other verbal or physical behavior of a sexual nature . . . has the effect or purpose of interfering unreasonably with the performance of such person's work or when it creates an intimidating, hostile, or offensive work environment."  29

L.P.R.A. §§ 155b–155b(c).  The relevant factors include the frequency and intensity of the alleged acts, the context in which they occurred, the duration of the conduct, and the actions and personal circumstances of the victim.  Rivera v. DHL Global Forwarding, 536 F.Supp.2d 148, 154 (D.P.R. 2008) (citing In re Robles Sanabria, 151 D.P.R. 483, 501 (P.R. 2000)).  Laws 17, 69, and 100 "serve virtually identical purposes and outlaw virtually identical behaviors."  Miro Martinez v. Blanco Velez Store, Inc., 393 F.Supp.2d 108, 114 (D.P.R. 2005); see also Rodriguez Melendez v. Sup. Amigo, Inc., 126 D.P.R. 117, 132–134 (P.R. 1990) (recognizing hostile work environment action under Law 100 prior to the enactment of Law 17).

González argues she is entitled to summary judgment based on her evidence of Torres's conduct; since he was her supervisor, she further reasons that the Hospital and its insurers are vicariously liable.  (Docket No. 97, ¶¶ 20, 22).  But as the Hospital defendants correctly argue, the evidence before the court does not inexorably establish that González was subjected to a hostile work environment.  Torres's overtures towards González in November 2006 occurred in the span of only three days, did not involve physical contact, and importantly, did not occur again.  Similarly, there is no evidence that anything in the nature of the Condom World gift exchange occurred again while Torres was employed at the Hospital.  In weighing Torres's directive during González's MRI study, a jury could rationally conclude that it was not objectively offensive: there is no evidence that Torres was present or watching when González undressed; he communicated his instructions through the MRI attendant; and it occurred in the context of a medical procedure.  And although non-explicit conduct *may* contribute to a hostile work environment if it is discriminatory, see O'Rourke, 235 F.3d at 729, nothing about Cruz or Torres's allegedly excessive discipline of González requires a finding of sex animus.  There is no evidence showing that he disciplined her because she was a woman.  Moreover, some of his alleged use of coarse language could be viewed as equally offensive to both the men and women who overheard it.  As for his sexually explicit language, a jury could rationally conclude that it was neither severe nor frequent, and was neither threatening nor humiliating to González.  Finally, although González was diagnosed with "anxiety or panic attacks," there is no

evidence leading to the conclusion that discriminatory conduct was the cause of this condition, and González offers no other evidence suggesting any impact on her work.  Cf. Ayala-Sepúlveda v. Municip. of San Germán, No. 10-2123, slip op. at 13 (1st Cir. Jan. 18, 2012) (rejecting hostile environment claim under § 1983 where there was "no evidence on the record that [plaintiff's] *work performance* suffered as a result of his anxiety.") (emphasis in original).

In short, a jury could rationally find that Torres's conduct "was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never, according to the record, an impediment to [González's] work performance."  Cf. Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 46 (1st Cir. 2003).  Therefore, González is not entitled to summary judgment on her hostile environment claim.

### C.      Duty to Prevent Harassment under Law 17

González also argues that the Hospital violated Law 17 by failing to prevent and correct Torres's sexual harassment against her.  (Docket No. 97, ¶¶ 35–36).  Law 17 imposes a duty on employers to express a policy against sexual harassment, make it known, and establish an effective procedure for handling complaints.  29 L.P.R.A. § 155i.  The obligation includes a guarantee that supervisors and employees "shall work with safety and dignity."  Id.

Because a jury may rationally conclude that González was not subject to sexual harassment, a jury may further rationally conclude that the Hospital did not breach its duty to prevent and investigate harassment.  Therefore, González is not entitled to summary judgment on this claim.

## III.   Hospital Defendants' Motion for Summary Judgment

The Hospital defendants seek summary judgment on the grounds that (1) González cannot establish a hostile work environment, (2) the *Faragher*/*Ellerth* defense shields them from liability, and (3) there is no evidence of retaliation against either González or Lugo.

### A.      González's Hostile Work Environment Claims

The Hospital defendants argue that González has not produced evidence showing an

actionable hostile work environment. Although the inquiry is necessarily fact-specific, "summary judgment is an appropriate vehicle for policing the baseline for hostile environment claims." Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006). But in the present case, viewing the record in the light most favorable to the non-moving party, a jury could rationally conclude that González was subjected to severe and pervasive harassment at the Hospital when taking account of the sum of her experiences.

According to González's account, at least some of Torres's alleged advances in November 2006 occurred while the two were alone after he locked them in his office. Based on both their verbal content and the physical surroundings, a fact finder could rationally find these advances to be both offensive and threatening. A jury could also find the Condom World-provisioned gift exchange in December 2006 offensive, even if not physically threatening, and take it into account. Moreover, the coworkers' statements offered by González permit an inference that Torres would often leer at women and use sexually charged language in the presence of other employees, which may be weighed along with the other evidence of Torres's conduct. See O'Rourke, 235 F.3d at 729 ("The accumulated effect of incidents of humiliating, offensive comments directed at women and work-sabotaging pranks, taken together, can constitute a hostile work environment."). Turning to Torres's participation in González's MRI, a jury could infer that because the technician initially told González a study of her head would not require undressing, Torres's unexpected instruction to undress was sexual in nature, objectively offensive, and humiliating. González also points to various disciplinary actions taken by Torres and Cruz between 2006 and 2008 which, in the context of her other complaints, could potentially be viewed as "charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment." See Lipsett v. Univ. of P.R., 864 F.2d 881, 905 (1st Cir. 1988). Although few of the particular episodes González complains of were independently severe, a jury viewing them in the aggregate could reasonably find severe and pervasive harassment. Because of this, the Hospital defendants have not established that they are entitled to summary judgment on this ground. I next turn to the Hospital's asserted

affirmative defense under *Faragher* and *Ellerth*.

### B.      Faragher/Ellerth Defense

The Hospital and Liberty argue they are immune from Title VII liability because they implemented a policy to prevent and correct sexual harassment, and because Torres was ultimately discharged.  Where the harasser is the plaintiff's supervisor, an employer may avoid liability if it shows that (1) it exercised reasonable care (a) to prevent harassment and (b) to eliminate it when it might occur, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Faragher, 524 U.S. at 805; Ellerth, 524 U.S. at 765; Torres-Negron v. Merck & Co., 488 F.3d 34, 40 n.5 (1st Cir. 2007). The employer bears the burden of proof on both prongs of the affirmative defense.  Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 34 (1st Cir. 2003).  The defense is available to the employer only if the employee did *not* experience a "tangible employment action," which typically means "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 524 U.S. at 761, 766.

At the outset, it is uncontested that González complained to Cruz and the Hospital of Torres's overt advances in mid-November 2006, culminating in a "Report of Inappropriate Harassment" on a Hospital-provided form on November 30, 2006.  (Docket No. 97-1, ¶ 6; Docket No. 154-1, ¶ 12). González inquired again on April 8, 2008.  (Docket No. 97-1, ¶ 22; Docket No. 154-1, ¶ 41).  A reasonable jury could conclude that bringing these two complaints was not an unreasonable failure to take advantage of the Hospital's procedures.  Moreover, to the extent that González arguably should have complained about Torres's conduct in the interim, such as the gift exchange or his use of crude language, a jury could rationally conclude that his continuing conduct reflected the Hospital's failure to curtail ongoing harassment.  Because there is a genuine dispute as to whether both elements of the defense are satisfied, the Hospital is not entitled to summary judgment.

### C.      González's Retaliation Claims

The Hospital defendants argue that González's retaliation claims should be dismissed

**Rosa Angela González-Santos,** *et al.* **v. Angel G. Torres-Maldonado,** *et al.*                    Page 21
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

because the acts she complains of were not retaliatory in nature.  Title VII prohibits discrimination

against an employee "because he has opposed any practice made an unlawful employment practice

by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3.  A plaintiff

relying on circumstantial evidence of retaliation bears the burden of establishing a *prima facie* case,

to wit: that "(1) he or she engaged in protected activity under Title VII, (2) he or she suffered an

adverse employment action, and (3) the adverse employment action was causally connected to the

protected activity."  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010)

(citation omitted).  This is "a small showing that is not onerous and is easily made." Che v. Mass.

Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003) (citation omitted).  The defendant in turn must

articulate a legitimate, non-retaliatory reason for the employee's termination.  Collazo, 617 F.3d at

46.  At the third stage, the burden shifts back to the plaintiff to establish that the employer's

proffered reason is a pretext for retaliatory animus.  Id.

    Adverse employment actions are acts "harmful to the point that they could well dissuade a

reasonable worker" from engaging in protected conduct.  Burlington Northern and Santa Fe Ry. Co.

v. White, 548 U.S. 53, 57 (2006).  This "should be judged from the perspective of a reasonable

person in the plaintiff's position, considering all the circumstances." Id. at 71 (internal quotation

omitted).  The conduct "need not relate to the terms or conditions of employment to give rise to a

retaliation claim." Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008) (citing Burlington

Northern, 548 U.S. at 70).  To show adverse action by means of a retaliatory environment, "a

plaintiff must show that she was subjected to severe or pervasive harassment that materially altered

the conditions of her employment."  Noviello, 398 F.3d at 92.  The harassment must be offensive

both to an objectively reasonable person as well as to the victim subjectively.  Id. This is a "totality

of the circumstances" analysis, and the court must ask whether a reasonable jury could conclude that

the conduct is actionable.  Id. at 94.  Circumstances include the "frequency of the [retaliatory]

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." Prescott

v. Higgins, 538 F.3d 32 (1st Cir. 2008) (listing factors in hostile environment race discrimination)

(internal citation omitted); Bibiloni Del Valle v. Puerto Rico, 661 F.Supp.2d 155, 172 (D.P.R. 2009)

(applying factors to retaliation).   In addition to considering these circumstances, retaliatory

environment claims demand a still "more nuanced analysis":

> The very act of filing a charge against a coworker will invariably cause tension and
> result in a less agreeable workplace. . . . The target of the complaint likely will have
> coworker-friends who come to his defense, while other coworkers will seek to steer
> clear of trouble by avoiding both the complainant and the target. Although admittedly
> a source of unpleasantness in the workplace, such behavior should not be seen as
> contributing to a retaliatory hostile work environment. . . . After all, there is nothing
> inherently wrong either with supporting a friend or with striving to avoid
> controversy. We think it follows that those actions that are hurtful to a complainant
> only because coworkers do not take her side in a work-related dispute may not be
> considered as contributing to a retaliatory hostile work environment. It is only those
> actions, directed at a complainant, that stem from a retaliatory animus which may be
> factored into the hostile work environment calculus.

Noviello, 398 F.3d at 93 (citations omitted).

Law 115 further prohibits discharge, threats, or discrimination against an employee who

offers or attempts to offer testimony or information before a legislative, administrative, or judicial

forum in Puerto Rico. 29 L.P.R.A. § 194a(a). To prevail, an employee must first present a prima

facie case of (1) participation in a protected activity and (2) adverse employment action. Upon doing

so, the burden shifts to the employer to "claim and provide a nondiscriminatory legitimate reason

for the discharge." Finally, the employee "should demonstrate that the alleged reason provided by

the employer was a mere pretext for the discharge." 29 L.P.R.A. § 194a(c).

In opposing summary judgment, González asserts that she was subjected to a series of

retaliatory acts by Torres between January 20, 2007 and March 14, 2008. (Docket No. 196, ¶ 24).

Problematically, however, she only supports this contention by citing a Spanish-language document

which was not accompanied or followed by an English translation. See Local Rule 5(g). This failure

to marshal competent evidence is an independently sufficient reason to grant summary judgment.

But even parsing through González's complaint and proffered evidence, her retaliation claim appears

to be based only on the fact that she received multiple disciplinary memos and admonishments from

**Rosa Angela González-Santos,** *et al.* **v. Angel G. Torres-Maldonado,** *et al.*                                Page 23
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

Torres between 2007 and 2008. She has not articulated the causal connection between her
November 2006 complaint and the discipline. Moreover, as the Hospital defendants persuasively
argue, González was not the only object of Torres's managerial scrutiny, and there is no evidence
that the other employees against whom Torres directed memos and comments engaged in any
protected activity. (Docket No. 205-1, p. 10). Because González has not adduced evidence from
which a jury could reasonably find that her work environment "stem[s] from a retaliatory animus,"
see Noviello, 398 F.3d at 93, she cannot establish that she suffered an adverse employment action,
and the defendants are entitled to summary judgment on the Title VII and Law 115 retaliation
claims.[3]

> **D.     Lugo's Title VII Retaliation Claim**

As the Hospital defendants correctly observe, Lugo has not presented any evidence that she
suffered any retaliation for assisting the hospital in its investigation of Torres in April 2008. (See
Docket No. 154, p. 32). Lugo's only discussion of her retaliation claim is an assertion that it is
timely because the fifth amended complaint refers to "a last retaliatory act on [the] part of . . . Cruz
towards her that occurred [in] August 2008." (Docket No. 196, p. 22). Notwithstanding that this
passing reference bears no resemblance to an "effort at developed argumentation" and the court is
under no obligation to do counsel's work, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir.
1990), a plaintiff cannot rest on the conclusory allegations of the complaint alone to survive
summary judgment. Because Lugo has not marshaled evidence from which she could establish a
*prima facie* case of retaliation, the Hospital defendants are entitled to summary judgment on her
claim.

> **CONCLUSION**

For the foregoing reasons, I recommend that Chartis's motion for summary judgment be
**GRANTED**, that plaintiffs' motion for summary judgment be **DENIED**, and that the Hospital

---

[3] Although Torres did not formally join the Hospital defendants' motion for summary judgment, it is appropriate
to dismiss the Law 115 claim against him since it rests on identical factual and legal grounds as the claim against Cruz.

**Rosa Angela González-Santos, *et al.* v. Angel G. Torres-Maldonado, *et al.***                    Page 24
Civil No. 09-1850 (FAB/BJM)
**REPORT AND RECOMMENDATION**

defendants' motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**.  All claims against Chartis should be **DISMISSED WITH PREJUDICE**.  Lugo and González's Title VII retaliation claims against the Hospital and Liberty as well as González's Law 115 claim against Torres and Cruz should be **DISMISSED WITH PREJUDICE**.  However, González's hostile environment claims against the Hospital, Liberty, and Torres should **NOT BE DISMISSED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court.  Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review.  See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 20th day of January, 2012.


*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge